UNITED STATES of America,
Plaintiff–Appellee,

v.

Juan CASTILLO, aka: Luis Hong Rojas, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Antonio DE LA RENTA,
Defendant–Appellant.

Nos. 87–5042, 87–5045.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1987.

Decided April 22, 1988.

As Amended on Denial of Rehearing and Rehearing En Banc Dec. 2, 1988.

As Amended Jan. 11, 1989.

Order and Second Amended Opinion Feb. 1, 1989.

Victor Sherman, Brian O'Neill, Santa Monica, Cal., for defendants-appellants.

Thomas K. Buck, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Appeal from the United States District Court for the Central District of California.

Before ALARCON and NELSON, Circuit Judges, and ROSENBLATT,* District Judge.

ALARCON, Circuit Judge.

In these consolidated appeals, Antonio De La Renta (De La Renta) and Juan Castillo, also known as Luis Hong Rojas (Castillo) (collectively appellants) seek reversal of their convictions for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982) and for being aliens in possession of a firearm in violation of Appendix II, 18 U.S.C. § 1202(a)(5) (Supp.1985).[1] They also challenge the judgment requiring forfeiture of $134,998 pursuant to 21 U.S.C. § 853(a) (Supp.1985).

Appellants contend that the district court erred in denying their motion to suppress evidence seized during the search of De La Renta's apartment. In addition, Castillo argues that the district court committed reversible errors during his trial and that the evidence was insufficient to support the jury's verdict. In addressing these contentions we must answer the following questions:

(1) Whether the affidavits presented in support of the request for the arrest warrant were sufficient to support the magistrate's finding of probable cause.

(2) Whether the district court's finding that the affidavits were not prepared with a deliberate or reckless disregard for the truth is clearly erroneous.

---

\* Honorable Paul G. Rosenblatt, United States District Judge for the district of Arizona, sitting by designation.

**1.** On May 19, 1986, Congress repealed this statute, effective 180 days from that date. Firearms Owners' Protection Act, Pub.L. 99–308, §§ 104(b), 110(a), 100 Stat. 449, 459, 460–61 (1986). The indictment was handed down prior to the effective date of the repeal.

(3) Whether the officers had sufficient facts to justify a protective sweep of De La Renta's apartment after he was arrested.

(4) Whether the district court's finding that De La Renta voluntarily consented to a search of his apartment was clearly erroneous.

(5) Whether, during closing argument, the Government improperly commented on Castillo's failure to produce evidence.

(6) Whether the district court erred when it gave the jury supplemental instructions on the meaning of "intent to distribute."

(7) Whether there was sufficient evidence of dominion and control to support the jury's finding that Castillo had possession of the cocaine, guns and currency found in De La Renta's apartment.

## I.

### FACTS

On June 29, 1986, a warrant for De La Renta's arrest was executed at De La Renta's apartment. The arrest team was comprised of federal and local law enforcement officers. When De La Renta opened the door, two officers of the Los Angeles Police Department (LAPD), Detectives Ray Martin and Michael Farrant, approached him with weapons drawn, identified themselves and stated the purpose of their visit. De La Renta was handcuffed and taken into the living room of the apartment.

Once De La Renta was in custody, the arrest team made a protective sweep of the apartment to assure themselves that no one else was present. During this sweep, the officers located two bedrooms. On entering the first bedroom, Detective Farrant saw some wrapped packages lying in plain view, between a nightstand and the wall. They were partially covered by a T-shirt and wrapped in the same manner that cocaine is packaged. The lettering on the outside of the packages was similar to that previously observed by Farrant on packages containing cocaine.

The second bedroom was locked. Farrant knocked on the door to the second bedroom and announced his presence. He could hear voices and noises inside. After announcing his presence two more times, he and a second officer forced entry into the bedroom. Castillo and Teresa Contreras were lying in the bed. Castillo was on the south side of the bed. The officers also observed a small amount of powder, which they believed to be cocaine, on top of the dresser in the second bedroom.

Farrant then took De La Renta into the first bedroom and obtained his verbal consent to search the apartment. De La Renta refused to sign a consent form. Farrant discussed the effect of De La Renta's refusal to sign a consent form with the other members of the arrest team. The officers decided that a search of the apartment was proper based on De La Renta's verbal consent. The search was terminated when one of the officers discovered a large sealed U-haul box in the second bedroom containing what appeared to be numerous packages of cocaine.

Farrant contacted Assistant United States Attorney Enrique Romero and described what had occurred at De La Renta's apartment to that point. Romero advised Farrant that the search could continue without a search warrant based on the oral consent. The officers resumed the search of the apartment. In the first bedroom, they found approximately 9,035 grams of cocaine, $130,598 in United States currency and two fully loaded handguns. In the second bedroom, the officers located a fully loaded Model 20 .25 caliber Beretta handgun and approximately $4,000 in one hundred dollar bills under the mattress on the south side of the bed where Castillo was first observed. On the floor, next to the south side of the bed was a compact containing 1.2 grams of 88% pure cocaine. On top of the dresser, in plain view, was .5 grams of 35% pure cocaine. A search of the dresser drawers revealed three clear plastic bags containing cocaine with a total weight of 935 grams of approximately 88% purity. On a shelf in the dresser, behind a door, the officers discovered a cannister

containing 119.9 grams of 77% pure cocaine, a triple beam scale, and weights of a type commonly used to weigh narcotics. A duffle bag containing rolls of various colored masking tape commonly used to package cocaine was next to the dresser. The U-haul box observed earlier on the floor of the second bedroom contained 48.7 kilograms of 88% pure cocaine. In a closet in the second bedroom, the officers found a clear plastic bag with 5.2 grams of 56% pure cocaine, and a Lipton tea bag with .8 grams of 83% pure cocaine, hidden in a leisure suit pocket. On the closet floor, the officers also found 609 grams of manitol, a common cutting agent used to dilute cocaine, a pink duffle bag with containers of manitol and Vitamin B blends, and more weights for a triple beam scale.

In the kitchen the officers found a plastic bag containing 29.9 grams of 36% pure cocaine on the counter top next to the stove.

After completing the search of the apartment, the officers allowed Castillo to go back to the second bedroom to get a shirt and pair of shoes. Detective Martin testified that when Castillo entered the second bedroom he showed irritation at the condition of the room. Castillo selected a shirt and pair of shoes from the clothing removed from the closet and dumped on the bed by the officers during the search.

Before leaving the apartment, DEA Agent Michael Wood removed two sets of keys from the top of a table in the entry way to the apartment. Wood asked Castillo and De La Renta to identify their keys. The set identified by Castillo included a key which operated the perimeter locks to that apartment building.

On July 10, 1986, a Federal Grand Jury returned a four-count indictment against Castillo and De La Renta. In count one of the indictment, Castillo and De La Renta were charged with possession with intent to distribute approximately 66 kilograms of cocaine. Each appellant was also charged with being an alien in possession of a firearm. Count four alleged that $134,998 found in De La Renta's apartment was subject to forfeiture. De La Renta entered a guilty plea to counts one, two and four pursuant to Fed.R.Crim.P. 11(a)(2), conditioned on his right to appeal the issues raised before the district court during pretrial proceedings. Following a jury trial, Castillo was convicted of counts one and three. The currency was forfeited pursuant to count four.

## II.

### MOTION TO SUPPRESS

On October 6, 1986, De La Renta and Castillo filed a joint motion to suppress all of the evidence discovered during the search of the apartment. They argued that the evidence seized was inadmissible because the officers did not act pursuant to a search warrant and the consent to search was involuntary.

The district court held an evidentiary hearing on the question of the validity of the consent on October 20, 1986. On that date, appellants advised the court that they would also challenge the arrest warrant. Pursuant to stipulation, appellants filed a second motion to suppress the evidence based on the alleged inadequacy of the arrest warrant and the lack of veracity of the allegations in the supporting affidavits.

After holding further hearings on the motion to suppress on November 24, 1986 and November 26, 1986, the district court ruled that the affidavit supporting the arrest warrant did not set forth sufficient facts to show probable cause to issue a warrant for De La Renta's arrest. The district court denied the motion to suppress, however, because it concluded that the arrest was valid under the good faith exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The district court also found that there were no deliberate or reckless falsehoods in the affidavits.

A further evidentiary hearing was held on the consent issue on December 4, 1986. Thereafter, the district court held that the protective sweep was proper and that De La Renta voluntarily consented to the search.

## A.  *Validity of The Arrest Warrant*

The district court found that the affidavits filed in support of the arrest warrant did not show probable cause because they were "technically deficient by reason of being overly conclusionary."  Appellants argue that *Leon* is inapplicable to a defective arrest warrant.  They also assert that all the evidence seized following De La Renta's arrest was tainted by illegal conduct and inadmissible.  The Government claims that the district court erred in finding that the affidavits were deficient.[2]

### 1.  *Standard of Review*

■ We have not previously expressed our view regarding the standard that must be applied in reviewing a district court's determination that the affidavits presented to a magistrate in support of an *arrest* warrant do not set forth sufficient facts to establish probable cause.  The Supreme Court, however, has instructed that in reviewing a magistrate's determination that probable cause exists to issue a *search* warrant, we must decide whether under the totality of the circumstances, "the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed."  *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).  The *Gates* standard of review applies to each court that is required to assess the validity of a search warrant.  *Id.*  Thus, under *Gates* we must review the magistrate's determination of probable cause to issue a search warrant independently of the conclusion reached by the district court.  Because the substantial basis test also applies to arrest warrants, *see St. John v. Justmann*, 771 F.2d 445, 448 (10th Cir.1985) (the Tenth Circuit applied the substantial basis test to the review of a magistrate's decision to issue an arrest warrant), we see no sound reason why the requirement that we conduct an independent review, to determine whether there was a substantial basis for the magistrate's conclusion that probable cause existed to justify the issuance of a search warrant, should not apply to the question whether there was probable cause to issue an arrest warrant.  Accordingly, we will review the magistrate's conclusion that probable cause existed to issue an arrest warrant independently without deferring to the district court's contrary conclusion.

■ In applying the substantial basis test, we must give deference to the magistrate's finding of probable cause.  We do not engage in *de novo* review.  *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir.1986).  "We may not reverse a magistrate's finding of probable cause unless it is clearly erroneous."  *Id.; accord United States v. Stanert*, 762 F.2d 775, 779, *amended and reh'g denied*, 769 F.2d 1410 (9th Cir.1985).  Our review is limited to the information contained within the four corners of the underlying affidavit.  *See Stanert*, 762 F.2d at 778 (court looks only to the information contained within the four corners of an affidavit when reviewing the validity of a search warrant).

### 2.  *Sufficiency of the Affidavits*

■ Applying the standard of review we have adopted in this case to these facts, we find that the district court erred in ruling that the affidavits did not establish probable cause to issue an arrest warrant.  Our review of the affidavits presented to the magistrate has convinced us that the magistrate had a substantial basis to support

---

**2.** The Government did not file a cross-appeal challenging the district court's holding that there was a lack of probable cause to support the arrest warrant.  Nevertheless, the Government's contentions can be considered in this appeal under the rule that an appellee may rely on any argument asserted below in support of the judgment.  *Hankerson v. North Carolina*, 432 U.S. 233, 240 n. 6, 97 S.Ct. 2339, 2344 n. 6, 53 L.Ed.2d 306 (1977).  *See also United States v. Choate*, 576 F.2d 165, 170 (9th Cir.) (unneces-sary to file a cross-appeal to support a judgment in appellee's favor on a claim that was advanced below), *cert. denied*, 439 U.S. 953, 99 S.Ct. 350, 58 L.Ed.2d 344 (1978).  *Cf. United States v. Moody*, 485 F.2d 531, 534 (3d Cir.1973) (when Government's appeal challenges a district court order suppressing evidence, the defendant-appellee "can raise issues with regard to findings and rulings relevant to that order under the umbrella of the government's appeal").

his conclusion that probable cause existed to issue an arrest warrant.

The magistrate based his finding of probable cause on two affidavits prepared by Special Agent Gregory D. Lee of the United States Drug Enforcement Agency (DEA). Lee has had over ten years' experience as a narcotics investigator.

The first affidavit was prepared to support the issuance of arrest warrants for eight individuals. This affidavit described an ongoing undercover investigation involving an alleged conspiracy to import cocaine into the United States. Lee alleged that on February 20, 1986 he met with Jose Luis Leon and John Robert Malpezzi, who were suspected drug dealers, and an undercover confidential informant, to set up a cocaine transaction. Lee was told that at the next meeting Leon would be accompanied by a "Columbian National." Lee was told to display the buy money to a "Columbian National who would then deliver the cocaine." On February 25, 1986, Lee and DEA Agent David R. Wilson met with Leon. When Lee arrived at the meeting, he was introduced to "Tony." Tony immediately departed from the meeting. Tony was followed by surveillance agents who eventually identified the Columbian as Antonio De La Renta, "a previously known cocaine dealer in the Los Angeles area." Lee stated that De La Renta and others spent the next several hours after the February 25 meeting attempting to obtain 50 kilos of cocaine to sell to him.

On June 20, 1986, Lee reviewed the first affidavit with the magistrate for approximately one and one-half hours. The magistrate requested that Lee prepare a supplemental affidavit regarding De La Renta's involvement in the scheme. In the second affidavit, Lee stated that during the February 20 meeting he was told that the Columbian National would be at the next meeting to "evaluate me and the situation, and would be the person who would determine if the transaction would take place." Malpezzi told Lee that De La Renta had stated that his sources of supply could not deliver all 50 kilograms of cocaine at once. Lee also alleged that De La Renta had been identified as a "previously well documented cocaine distributor in the Los Angeles area."

The information contained in these affidavits establishes a substantial basis for concluding that probable cause existed to believe that De La Renta was engaged in the illegal sale and distribution of cocaine. An experienced drug enforcement officer informed the magistrate that De La Renta was present at a meeting regarding a large scale cocaine transaction, that he was a known cocaine dealer, and that another member of the conspiracy, unaware that Lee was a DEA agent, had told Lee that De La Renta could not acquire all of the necessary cocaine at one time. While it is true that the affidavits contain some conclusions of the officers, and the alleged facts are insufficient to establish guilt beyond a reasonable doubt or even a prima facie case, the information was sufficient to establish the probability that De La Renta was guilty of the cocaine trafficking. *See Gates*, 462 U.S. at 235, 103 S.Ct. at 2330 (affidavits are sufficient if they show a probability of criminal activity, a prima facie case need not be established).

### 3. *Hearsay Statements in Arrest Warrant Affidavits*

■ Appellants argue that hearsay statements cannot be considered in determining whether probable cause exists to justify an arrest. The law is to the contrary. A magistrate may consider hearsay statements in an affidavit in determining whether there is probable cause to believe that a person is guilty of a crime. *See Gates*, 462 U.S. at 238, 103 S.Ct. at 2332 (a magistrate may consider all of the circumstances set forth in an affidavit including hearsay statements); *United States v. Guerrero*, 756 F.2d 1342, 1348–49 (9th Cir.) (a magistrate can consider hearsay statements in an application for a search warrant if there is a substantial basis for crediting the hearsay), *cert. denied*, 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984).

■ The affidavits provided a substantial basis for crediting the hearsay statement that De La Renta could not acquire

all of the necessary cocaine at one time. The statement was made by an accomplice, as part of the negotiations preparatory to the sale of narcotics. Malpezzi was not aware that Lee was a DEA agent and had no apparent reason to give him false information about De La Renta. Thus, the magistrate did not err in considering the hearsay statements in the affidavits. *See People v. Fleming,* 29 Cal.3d 698, 708, 175 Cal.Rptr. 604, 611, 631 P.2d 38, 45 (1981) (hearsay statements of an accomplice to an undercover law enforcement officer included in an affidavit to show probable cause are presumed reliable).

### 4. *Veracity of the Affidavits*

■ Appellants also argue that Lee prepared the affidavits with a deliberate or reckless disregard for the truth. Specifically, appellants challenge the statements that De La Renta was a previously known and well-documented cocaine dealer in the Los Angeles area.

The Supreme Court has held that an otherwise valid search warrant can be rendered invalid if the defendant shows that an affiant deliberately, or with reckless disregard for the truth, included false statements in his application for a warrant. *Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Pursuant to *Franks,* a hearing is required to determine whether false statements were deliberately or recklessly included in the affidavit. *Id.*

In the matter before this court, the district court held a *Franks* hearing to determine whether Lee had deliberately or recklessly included false statements in the affidavit. The court found that there was no "demonstration of deliberate falsehood or reckless disregard for the truth."

"The district court's conclusion about whether the defendant has demonstrated recklessness or deliberate falsity after the *Franks* hearing ... is a finding of fact reviewed under the clearly erroneous standard." *United States v. Ritter,* 752 F.2d 435, 439 (9th Cir.1985). The district court's findings were not clearly erroneous.

During the *Franks* hearing, Special Agent Lee testified that he had at least two sources for his information regarding De La Renta's involvement in cocaine trafficking: a DEA agent in Riverside and a former DEA informant who was present during the February 25, 1986 meeting with the suspected dealers. The district court found that Lee was a credible witness after observing his demeanor during direct and cross-examination. There is nothing in this record that demonstrates that the district court's finding that Lee was a credible witness is clearly erroneous. *See United States v. Hodges,* 770 F.2d 1475, 1478 (9th Cir.1985) (questions of credibility are generally immune from appellate review).

The arrest warrant was not rendered invalid because of any false or misleading statements in the affidavits. The magistrate's conclusion that there was probable cause to support the issuance of the arrest warrant was supported by substantial evidence. Because the arrest warrant was valid, we do not reach the question whether the good faith exception to the exclusionary rule applies to a defective *arrest* warrant.

### B. *Validity of the Protective Sweep*

■ Appellants also seek reversal on the ground that the protective sweep of the premises following De La Renta's arrest was invalid and tainted all the evidence seized in the apartment. Appellants argued to the district court that the officers conducted the protective sweep of the interior of the apartment as a routine matter without knowledge of any specific facts that they faced a threat of violence.

It is quite true that one of the officers testified that it is "standard procedure to do a protective sweep of the premises." The district court quite properly rejected this testimony as a "flip remark" and insufficient to justify an entry. The district court concluded that

> an analysis of the facts that were confronting the officers who were thinking about it—and I think many of them were—would lead you to believe that there was every expectation of the possi-

bility of harm. I don't see how we can turn our backs on them on that, I really don't.

Thus, it is clear that the district court accepted as true the testimony of the officers concerning all the facts known to them prior to the entry that led them to believe that they faced personal danger should anyone else be present in the apartment.

Before proceeding to analyze the facts to determine the correctness of the district court's finding that the protective sweep was justified, we wish to make unmistakenly clear that we understand, as did the district court, that the fourth amendment was adopted for the very purpose of protecting us from "routine" intrusions by governmental agents into the privacy of our homes. It is dismaying that any trained police officer in the United States would believe otherwise, as we approach the two hundredth anniversary of the fourth amendment. It is our fervent hope that every police officer made aware of this decision will understand that "routine" violations of the constitution will in all cases result in the exclusion of evidence and may compel the courts to release a guilty person.

We have independently examined the record in this case. We agree with the district court that, notwithstanding the fact that at least one of the officers apparently believed he was entitled to make a protective sweep as a matter of routine, the officers collectively had knowledge of specific facts that led them reasonably to believe that other persons might be present on the premises at the time of the arrest.

Under the law of this circuit, we must engage in a three-step analysis in reviewing a district court's determination that exigent circumstances justified the entry of a residence. *United States v. Hicks,* 752 F.2d 379, 383 (9th Cir.1985); *United States v. McConney,* 728 F.2d 1195, 1200 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

First. The trial judge's findings that certain facts occurred, the weight accorded to the evidence and the credibility of

witnesses are reviewed under the deferential, clearly erroneous standard....

Second. The selection by the trial court of the applicable law is reviewed de novo. Third. The application of the law to the facts as established by the district court is subject to de novo review.

*United States v. Hicks,* 752 F.2d at 383.

In *United States v. Gardner,* 627 F.2d 906 (9th Cir.1980), we discussed the validity of protective sweeps following a lawful arrest. In *Gardner* we said "[w]hen officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." *Id.* at 909–10 (footnote omitted). "[T]he Government must be able to 'point to specific and articulable facts which, taken together with rational inferences from those facts, [would] reasonably warrant [the warrantless] intrusion.'" *Id.* at 910 (quoting *United States v. Dugger,* 603 F.2d 97, 99 (9th Cir.1979)). We have also held that "'[c]ourts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.'" *United States v. Astorga–Torres,* 682 F.2d 1331, 1335 (9th Cir.1982) (quoting *United States v. Coates,* 495 F.2d 160, 165 (D.C.Cir.1974)), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed. 2d 608 (1982) and 459 U.S. 1108, 103 S.Ct. 734, 74 L.Ed.2d 957 (1983).

Subsequent to our decision in *Gardner,* we held, in our *en banc* decision in *McConney,* that "[w]hen police have properly knocked and announced their identity and purpose, *mild* exigency is sufficient to justify simultaneous entry when entry can be accomplished without physical destruction of property." 728 F.2d at 1206 (emphasis added). We also concluded in *McConney* that "[m]ild exigency may exist where there is a likelihood that the occupants will try to escape, *resist,* or destroy evidence." *Id.* (emphasis added).

The evidence shows that the officers knocked on the door to De La Renta's

apartment, identified themselves, and stated their purpose for being there. They entered the apartment without destroying any property. It is not clear to us, however, whether the mild exigency test set forth in *McConney* is applicable to a protective sweep that follows an entry after an arrest based on a warrant. We did not reach this issue in *McConney* because there the challenged evidence was found after a search in the room first entered. Because the facts known to the officers in the instant matter, that were credited by the district court, demonstrate that these experienced narcotics officers had a reasonable belief that other persons might be on the premises, we have concluded that a protective sweep was justified under the more stringent test set forth in *Astorga–Torres*. Accordingly, we need not decide today whether the *McConney mild* exigency test is applicable under these circumstances.

The testimony of the officers regarding their knowledge of the events that occurred prior to their entry, found credible by the district court, may be summarized as follows:

One. DEA Special Agent Gregory D. Lee and a confidential informant met with Jose Luis Leon and John Robert Malpezzi, who were suspected drug dealers, on February 20, 1986, to set up a cocaine transaction. Lee was told that at the next meeting, a Colombian national would deliver the cocaine.

Two. Lee was informed at the February 20, 1986 meeting that the Colombian national "would be the person to determine if the transaction would take place."

Three. At the next meeting, on February 25, 1986, Lee met with Leon and De La Renta, the Colombian national. De La Renta was identified as a cocaine dealer in the Los Angeles area.

Four. Also present at the February 25, 1986 meeting was a man named Garcia, who was hired by Malpezzi to kill Lee if it

was determined that he was a law-enforcement officer.[3]

Five. The officers who participated in the sweep testified that it was their experience with cocaine dealers that they had a tendency to carry weapons and would resort to violence.

■ In determining whether the articulated facts set forth above demonstrated the existence of an exigency so as to justify a warrantless entry, we must consider the totality of the circumstances. "[E]ach case necessarily turns on its own peculiar facts." *United States v. Martin*, 509 F.2d 1211, 1213 (9th Cir.), *cert. denied*, 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975). It is immaterial that none of the circumstances found true by the district court, standing alone, demonstrate exigent circumstances. Instead we must look at all the facts known to the officers and consider all the reasonable inferences that could be drawn by them concerning the need to conduct a protective sweep to protect them from violence.

■ We are also required to consider the expertise of an experienced narcotics officer as a factor in determining whether the fourth amendment's requirements have been satisfied. The fact that the untrained person, unaware of the propensities of narcotics dealers, would not consider the situation faced by an officer as dangerous is not controlling. *See United States v. Bernard*, 623 F.2d 551, 560 (9th Cir.1979) (quoting the D.C. Circuit's holding that "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *Davis v. United States*, 409 F.2d 458, 460 (D.C.Cir.), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969)).

What reasonable inferences can be drawn from the facts collectively known by the officers prior to the entry of De La Renta's apartment? De La Renta was well known to the DEA as a cocaine dealer in the Los Angeles area. De La Renta was a

---

**3.** Some of these facts were set forth in the affidavits filed in support of the arrest warrant. Officer Farrant testified that he saw these doc-

uments before going to De La Renta's apartment.

principal member of a conspiracy engaged in selling large amounts of cocaine. The officers also had personal knowledge, based on past field experience, that cocaine dealers carry guns and resort to violence. This expert knowledge was corroborated in this matter by evidence that one of De La Renta's co-conspirators had hired an assassin to kill a DEA Agent, Lee, who was pretending to be a narcotics trafficker, if he turned out to be a law-enforcement officer. Thus, the officers were aware that members of the conspiracy, ostensibly led by De La Renta, would kill law-enforcement officers. De La Renta was arrested in the open doorway to his apartment. While the officers did not know if any one else was in the apartment at the time of the entry, they were aware that several persons were participants in De La Renta's conspiracy, any one of whom might be then present in the De La Renta apartment guarding their cocaine supply or large sums of money received from prior sales. We fully understand that we must look only at the facts known to the officers prior to the entry in deciding whether a protective sweep was valid. We are satisfied that the facts known to the officers prior to their entry demonstrate that their intrusion was warranted.

We also note, in passing that the record shows that when the officers entered, they found Castillo, a large quantity of cocaine, over $130,000 in cash, and three fully loaded handguns. If nothing else, this discovery demonstrates the wisdom of this court's admonition that " '[c]ourts must be careful not to use hindsight in limiting the ability of police officers to protect themselves as they carry out missions which routinely incorporate danger.' " *Astorga–Torres*, 682 F.2d at 1335 (quoting *Coates*, 495 F.2d at 165).

In none of the cases relied upon by appellants did the evidence show that a member of an ongoing conspiracy to distribute large quantities of narcotics engaged a hired gun to kill undercover police officers. For example, in *United States v. Whitten*, 706 F.2d 1000, 1016 (9th Cir.1983), *cert. denied* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984), we concluded that the mere fact that an individual was arrested in the doorway of his hotel room did not establish exigent circumstances to enter to conduct a search without a warrant. In *Whitten*, there was no testimony that the officers suspected that anyone associated with the defendant might be in the vicinity of the arrest. *Id.* *United States v. Spetz*, 721 F.2d 1457 (9th Cir.1983) is also readily distinguishable. In *Spetz* the suspects were arrested outside the house in the driveway. *Id.* at 1462. In the instant matter, the arrest was in the open doorway to the apartment. The danger to an officer making an arrest in an area removed from an open doorway is far less.

We have independently reviewed the record to determine whether at the time of the entry sufficient exigent circumstances existed to justify a protective sweep of the premises. This scrutiny has satisfied us that the officers reasonably believed that armed members of De La Renta's conspiracy to sell cocaine might also be present on the premises. We conclude, therefore, that the protective sweep was valid.

### C. *Validity of the Search of the Apartment*

After the protective sweep was completed, Detective Farrant asked De La Renta for permission to search the apartment. Farrant testified that he spoke to De La Renta in English and his answers were responsive. Farrant told De La Renta that if he did not consent to a search, Farrant would "go to a judge and try to obtain a search warrant." Farrant also informed De La Renta that he did not know whether the judge would give him a search warrant. De La Renta consented to a search but refused to sign a consent form. De La Renta testified that he did not orally consent to a search. He testified further that he refused to sign a written consent form and asked for an attorney.

The district court found that De La Renta voluntarily consented to the search of the apartment. Appellants claim that the record shows that De La Renta's consent was not free and voluntary.

"Whether consent to search was voluntarily made is a question of fact reviewed under the 'clearly erroneous' standard." *United States v. Licata,* 761 F.2d 537, 544 (9th Cir.1985). Voluntariness is "based on the totality of circumstances surrounding the giving of consent." *United States v. Alfonso,* 759 F.2d 728, 740 (9th Cir.1985). On appeal the evidence must be viewed in the light most favorable to the fact-finder's decision. *Id.*

We have previously indicated that several factors must be considered in determining whether consent is voluntary. None of them are dispositive. *See Ritter,* 752 F.2d at 439 (absence of Miranda warnings is not dispositive of the question whether consent was voluntary); *United States v. Tolias,* 548 F.2d 277, 278 (9th Cir.1977) (arrest is a factor in determining voluntariness but valid consent can be given while defendant is in custody). These factors include: (1) whether defendant was in custody, *Alfonso,* 759 F.2d at 741; (2) whether the arresting officers have their guns drawn, *United States v. Al-Azzawy,* 784 F.2d 890, 895 (9th Cir.1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986); *Alfonso,* 759 F.2d at 741; (3) whether Miranda warnings have been given, *Al-Azzawy,* 784 F.2d at 895; *Alfonso,* 759 F.2d at 741; (4) whether the defendant was told he has a right not to consent, *Al-Azzawy,* 784 F.2d at 895; and (5) whether defendant was told a search warrant could be obtained, *United States v. Salvador,* 740 F.2d 752, 757 (9th Cir.1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). The fact that some of these factors are not established does not automatically mean that consent was not voluntary. *See, e.g., Ritter, Tolias.*

De La Renta was in custody at the time he consented. Farrant and De La Renta were the only persons present in the room where the conversation took place. Farrant's gun was holstered. De La Renta was told he had a right not to consent, and if he chose not to, the officers would attempt to get a search warrant. *See Salvador,* 740 F.2d at 757 (a statement to the defendant that he need not consent is evidence of voluntariness). Farrant also in-

formed De La Renta that he did not know whether a judge would issue a search warrant.

Appellants argue that De La Renta's refusal to sign a written consent form vitiated any oral consent. In *United States v. Boukater,* 409 F.2d 537, 539 (5th Cir.1969), the Fifth Circuit held that refusal to sign a consent form, while a factor to be considered, did not preclude a finding of voluntariness.

An analogous situation arises when a person orally waives his right to remain silent or to have counsel present but refuses to sign a waiver form. In *North Carolina v. Butler,* 441 U.S. 369, 371, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1979), the defendant refused to sign a waiver form. He told the officers, "I will talk to you but I am not signing any form." The Supreme Court held that refusal to sign a waiver form does not conclusively demonstrate that there was no waiver. *Id.* at 375–76, 99 S.Ct. at 1758–59. The Supreme Court instructed in *Butler* that courts must look at all of the circumstances to determine whether there was a waiver. *Id.* at 374–75, 99 S.Ct. at 1758.

The same analysis is applicable to a consent to search. The test is whether there was a voluntary consent. Voluntariness is "determined from all the surrounding circumstances." *Al-Azzawy,* 784 F.2d at 895. Execution of a consent form is one factor that indicates that consent was voluntary.

The facts presented by the Government demonstrate that De La Renta orally consented. The court did not believe De La Renta's testimony that he did not consent. The district court's determination that De La Renta voluntarily consented was not clearly erroneous.

## III.

## ALLEGED ERRORS DURING CASTILLO'S TRIAL

Castillo seeks reversal of his conviction based on alleged errors committed during the guilt phase of the trial. He contends that (1) the Government improperly com-

mented during closing argument on his failure to produce evidence; (2) the court incorrectly charged the jury; and (3) the Government failed to establish beyond a reasonable doubt that he had dominion and control over any contraband.

**A.** *Alleged Prosecutorial Misconduct During Closing Argument*

■ During closing argument, the Government commented on two factual matters not contested by contrary defense testimony. The Government argued that Castillo had not presented any evidence that he did not live in De La Renta's apartment. The prosecutor told the jury:

For all of those reasons, we're saying, yes, he was residing—he was residing there.

And we consider that testimony. And we ask, "Well, if that's true—if"—excuse me. If that were true, what would be the testimony the defense would present? If he wasn't residing there, wouldn't the defense call the apartment manager of the apartment where Mr. Castillo really was residing?

The Government also argued that there had been no evidence that Castillo held any job other than distributing cocaine. The Government counsel argued as follows:

I submit to you that the evidence supports the Government's position that Mr. De La Renta and Mr. Castillo's job was running cocaine.

And I ask you to weigh that against any testimony to the contrary, that this person who is an alien, illegally in the United States, had some other job than the government—which the Government submits.

Castillo contends that these statements constituted an impermissible reference to his failure to testify.

It is well established that the privilege against self-incrimination prohibits a prosecutor from commenting on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965). However, a "prosecutor may properly comment upon a defendant's failure to present witnesses so long

as it is not phrased to call attention to defendant's own failure to testify." *United States v. Fleishman*, 684 F.2d 1329, 1343 (9th Cir.), *cert. denied*, 459 U.S. 1044, 103 S.Ct. 464, 74 L.Ed.2d 614 (1982); *accord Territory of Guam v. Ojeda*, 758 F.2d 403, 406 (9th Cir.1985); *United States v. Passaro*, 624 F.2d 938, 944 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981). The test is whether the comment is "manifestly intended to call attention to the defendant's failure to testify, and is ... of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *United States v. Bagley*, 772 F.2d 482, 494 (9th Cir.1985), *cert. denied*, 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986). In addition " '[a] comment on the failure of the *defense* as opposed to the *defendant* to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege.' " *United States v. Wasserteil*, 641 F.2d 704, 709–10 (9th Cir.1981) (quoting *United States v. Dearden*, 546 F.2d 622, 625 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977)).

The Government commented on Castillo's failure to produce evidence and witnesses, not his failure to testify. The Government made specific reference to the type of witness that could have been presented, such as Castillo's apartment manager. At no time was there any express reference to Castillo's failure to testify. Instead, the Government asked the jury to consider, in weighing the evidence, that the *defense* did not rebut certain evidence presented by the prosecution.

■ While we have concluded that the authorities cited above require us to hold that the Government's argument did not violate the constitution, we do so under compulsion of the law of this circuit and with strong misgivings. We want to make clear that this panel of three judges does not condone or approve of the Government's argument in this case. As a member of the federal government, every Assistant United States Attorney has a constitutionally imposed duty to protect every

individual's privilege against self-incrimination. Any comment on the absence of defense evidence, beyond pointing out that the Government's proof is uncontradicted, risks speculation by a juror that the defendant must be guilty or else he would have testified. No prosecutor should take pride in obtaining a conviction by artfully or unintentionally inducing a jury to find a defendant guilty on improper and unconstitutional grounds. We affirm in this case because there is no evidence that any juror was mislead; thus, no constitutional error has been demonstrated. We recognize, however, as should all Government lawyers, that such evidence is almost impossible to produce. Repeated resort to the type of argument employed here may compel some court some day to conclude that the risk that this tactic will cause jurors to focus on the defendant's failure to testify is intolerable.

### B. *Propriety of the Jury Instructions*

Castillo contends that the district court made several errors in its response to jury questions. During its deliberation, the jury requested information regarding the testimony of one of the witnesses. Castillo argues that the district court erred in failing to respond to that request, and in refusing to require the court reporter to read the testimony to the jury. The jury also informed the court that it was having problems understanding the words "intent to distribute." Castillo claims that the district court gave a misleading instruction in response to this request. He also argues that the court erred in failing to give his requested Supplemental Jury Instruction No. 16.

### 1. *Request for testimony of a witness*

On December 22, 1986, the jury requested "a copy of Detective Martin's testimony regarding the size of the clothes in the closet of bedroom # 2. Specifically, did he say if the clothes were of the size that Castillo wore and if they were all that size." There is nothing in the record that indicates whether the court responded to this request. Detective Martin's testimony was not read to the jury.

■■■ We review a district court's decision not to require that testimony be read to the jury for abuse of discretion. *United States v. Nolan*, 700 F.2d 479, 486 (9th Cir.), *cert. denied*, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983); *United States v. King*, 552 F.2d 833, 850 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). "A trial court is given great latitude in deciding whether to reread testimony requested by the jury. In general, rereading is disfavored because of the emphasis it places on specific testimony and the delay it causes in the trial." *Nolan*, 700 F.2d at 486.

■■■ The district court's failure to respond to the jury's request or to order the reporter to read the officer's testimony was not an abuse of discretion. Reading of the witness' testimony would have placed undue emphasis on evidence previously presented to the jury.

### 2. *Validity of the supplemental instructions given to the jury*

■■■ At the end of the first day of deliberations, the district court received a note from the jury stating that it had decided count three but was having problems with count one. The jury was returned to the courtroom. The court was informed that the jury was having difficulty understanding the meaning of the words "intent to distribute." The court advised the jury that it was going to give them "some illumination in the morning." The jury was then told that

> in only the rarest occasions would you ever have direct evidence of an intention to distribute. You have to be dealing with circumstantial evidence, as my instructions, quantity, street value, the impossibility of it ever being used for personal consumption; that sort of thing.

The next day, over Castillo's objection to any further instructions, the district court admonished the jury as follows concerning proof of intent:

> Intent ordinarily may not be proved directly, because there is no way of fath-

oming or scrutinizing the operations of the human mind.

But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by the defendant and all other facts and circumstances in evidence which indicates his state of mind.

The jury was then given the following instruction concerning proof of possession:

Now if there is possession of contraband—as I have instructed you, as defined in the instructions I gave you—logically, it has to be—there are only three possibilities with regard to the intent behind that possession:

One is that the contraband is held for personal use. Two, it is held for transfer of some kind; sale or even giving away, but transfer of some kind.

And the third possibility is that it may be held for—partly for personal use and partly for transfer.

In the case of either two or three, it is, of course, held for distribution.

Now, I want to refer specifically to the page of the instructions which you have that is numbered 37, which talks about particular factors which you can take into account and make any judgment as to the issue of intent to distribute.

And when I focus on 37, I do not mean that you should ignore the other instructions and just consider that one alone. Because it might not be a bad idea for you to review all the instructions that have to do with Count One.

Castillo contends it was clear error for the trial court to tell the jury that direct evidence of intent to distribute is available "in only the rarest occasions." He argues that the statement is false and misleading. He claims that "[i]n effect, the court was telling the jury that it did not have to consider the lack of direct evidence of appellant's intent in possessing cocaine." Castillo also argues that the jury was "misled by the court's instruction … that appellant could be found guilty if he held the contraband for transfer of some kind or if partly held for personal use and partly for transfer." Castillo asserts that this instruction could mislead the jury into finding "that the small amount of cocaine found on top of the dresser or in the locket was possessed by appellant with the intent to share it with Teresa Contreras."

Jury instructions must be reviewed as a whole. *United States v. Marabelles*, 724 F.2d 1374, 1382 (9th Cir.1984). "Challenged error in the language of the trial judge's jury instruction will justify reversal only if abuse of discretion is shown." *United States v. Patel*, 762 F.2d 784, 790 (9th Cir.1985). The standard of review is the same when reviewing supplemental jury instructions given in answer to a jury's question. *United States v. Hayes*, 794 F.2d 1348, 1352 (9th Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

Castillo relies on *United States v. Stephens*, 569 F.2d 1372 (5th Cir.1978) to support his argument that the instruction was improper. In *Stephens*, the district court instructed the jury that knowledge, a necessary element to an offense, could be found by looking at what a reasonable person would know or should have known. *Id.* at 1374. The Fifth Circuit held that this was a clear misstatement of the law. *Id.* Here, the district court's admonition regarding direct proof of intent was not a misstatement of the law. An undisclosed intent is ordinarily not subject to proof by direct evidence. The district court did not err in its statement of the applicable law in response to the jury's questions.

### 3. *Propriety of the failure to give Castillo's proposed supplemental instruction*

■ Castillo contends that the court's failure to give his proposed Supplemental Jury Instruction No. 16 was an abuse of discretion. The proposed instruction reads as follows:

The defendant in this case has been charged with possession with intent to distribute cocaine. He has not been charged with simple possession of cocaine. Therefore, if you do not find that the defendant had the requisite specific

intent to distribute, but that he merely possessed the cocaine for personal use or any other reason, you should find the defendant not guilty of count one of the indictment.

"The trial judge is given substantial latitude in tailoring the instructions, and a challenge pertaining to the trial judge's language or formulation of the charge is reviewed only for abuse of discretion." *United States v. Burgess*, 791 F.2d 676, 680 (9th Cir.1986).

The district court properly instructed the jury concerning the elements of the charged crimes. A party may not demand that specific language be read to a jury. *United States v. Frazin*, 780 F.2d 1461, 1468 (9th Cir.1986). The court did not abuse its discretion in refusing to give the instructions suggested by Castillo.

## C. *Sufficiency of the Evidence*

Castillo contends that the evidence was insufficient to demonstrate that he had dominion and control over any of the cocaine, handguns, or currency found in the apartment. He also argues that the Government failed to prove that he had knowledge of the presence of any of these items.

To resolve a challenge to the sufficiency of the evidence, we must review the record to determine whether there is substantial evidence to support the jury's implied factual findings. Substantial evidence exists if we are satisfied after an independent examination of the record that "a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." *United States v. Douglass*, 780 F.2d 1472, 1476 (9th Cir.1986). It is undisputed that, to sustain a conviction in this matter, the Government was required to prove that Castillo had dominion and control of the cocaine, the handgun, and the currency, and knowledge of their existence. *See United States v. Disla*, 805 F.2d 1340, 1350 (9th Cir.1986) (the Government must prove "a sufficient connection between the defendant and the contraband to support

the inference that the defendant exercised a dominion and control over the substance"). The Government may demonstrate dominion and control by proof of actual physical custody or constructive possession. *United States v. Batimana*, 623 F.2d 1366, 1369 (9th Cir.), *cert. denied*, 449 U.S. 1038, 101 S.Ct. 617, 66 L.Ed.2d 500 (1980). A person has constructive possession of an object if he has sufficient dominion and control to give him the power of disposal. *Id.* Possession and knowledge can be established by circumstantial evidence. *See United States v. Montes–Cardenas*, 746 F.2d 771, 778 (11th Cir.1984) (constructive possession can be established by circumstantial evidence). "Mere proximity to contraband, presence on property where it is found and association with a person or persons having control of it are all insufficient to establish constructive possession." *United States v. Rodriguez*, 761 F.2d 1339, 1341 (9th Cir.1985). However, "[i]f the defendant has exclusive control over the premises where contraband is found, then knowledge and control may be inferred." *Id.*

In support of his challenge to the sufficiency of the evidence, Castillo relies on several cases from this circuit in which we have held that the evidence did not demonstrate knowledge or dominion and control. In each of these cases, wherein we reversed the conviction, we concluded after reviewing the record that the evidence showed mere presence. A comparison of the dispositive facts in the cases collected in Castillo's briefs, with the contrasting evidence in the instant matter, will demonstrate that the Government's proof was clearly sufficient.

In *Delgado v. United States*, 327 F.2d 641 (9th Cir.1964), marijuana was found in the drawer of a nightstand in a bedroom shared by the two defendants. We held that, because it was pure speculation as to which defendant had possession of the marijuana, neither could be convicted. *Id.* at 642. In *Delgado*, the room where the marijuana was found was used at all times by both defendants. There was no evidence to connect either defendant to the marijuana.

In *United States v. Valenzuela*, 596 F.2d 824 (9th Cir.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2415, 60 L.Ed.2d 1071 (1979), the defendant and her husband lived on the premises where heroin was found in the garage in a bag bearing his name. There was no other evidence connecting her to the heroin. We sustained the conviction of the husband, but concluded that proof of joint occupancy of the home was insufficient evidence that she had dominion and control of the narcotics. *Id.* at 830–31.

In *Arellanes v. United States*, 302 F.2d 603 (9th Cir.), *cert. denied*, 371 U.S. 930, 83 S.Ct. 294, 9 L.Ed.2d 238 (1962), Geneva Arellanes and her husband, Alfredo, were arrested when contraband was found in the car the husband was driving. The contraband was found behind and beneath the rear seat of the car and in a shaving kit that was sitting on top of personal effects on the back seat. We concluded that evidence was sufficient to convict Alfredo Arellanes of possession of the narcotics in the car because he had exercised exclusive dominion and control over the vehicle. We stated that exercise of exclusive dominion and control "is a potent circumstance tending to prove knowledge of the presence of [the] narcotics and control thereof." *Id.* at 607 (quoting *Evans v. United States*, 257 F.2d 121, 128 (9th Cir.), *cert. denied*, 358 U.S. 866, 79 S.Ct. 98, 3 L.Ed.2d 99 (1958)). In reversing the conviction of Geneva Arellanes we stated that her presence as a passenger in a car where narcotics was found was "as fully explained by her attachment to her husband as it might by a control over the drugs." *Id.* at 606.

In *Rodriguez*, Dennis Rodriguez and Jennifer West were convicted of possession of counterfeit bills with the intent to defraud. 761 F.2d at 1340. They were arrested in a motel room in which counterfeit bills were found. *Id.* We affirmed West's conviction because the evidence showed that she attempted to hide counterfeit bills and other evidence of an ongoing counterfeiting operation while the police questioned her about a robbery that had occurred in another part of the motel. *Id.* at 1341. We held that proof of the attempted "coverup" demonstrated dominion and control over the coun-

terfeiting materials. *Id.* We reversed Rodriguez's conviction because the only evidence against him was his presence in the room and his ability to observe the contraband. *Id.*

In *United States v. Behanna*, 814 F.2d 1318 (9th Cir.1987), a machine gun was found in a nylon bag on the floor behind the driver's seat of an automobile in which the defendant, Barbara Behanna, was a passenger. The driver and the passenger were convicted of possession of the machine gun. We affirmed the conviction of the driver but reversed as to the passenger. We held that "the government must do more than show that the defendant was present as a passenger in the vehicle and within reach of the weapon." *Id.* at 1320.

In *Batimana*, 623 F.2d at 1369–70, heroin was delivered to Edgardo Lavadia in a hotel room. The evidence showed that Lavadia had arranged to sell the narcotics to Samuel Nicanor. Minutes after the delivery, and prior to the completion of the sale, all the persons in the hotel room were arrested. The evidence showed that appellants were acting as lookouts at the hotel. On appeal, we concluded that the evidence was sufficient to affirm a conviction for conspiracy to import and possess with intent to distribute heroin. We reasoned that the evidence of possession was insufficient, however, because there was no proof that the appellants had actual or constructive possession of the heroin. *Id.* at 1369. The heroin was in Lavadia's exclusive physical possession during the brief time that elapsed between the delivery of the heroin to the hotel room and the arrest of appellants. We held in *Batimana* that the mere presence of the appellants as lookouts was insufficient to demonstrate dominion and control. *Id.*

In *United States v. Penagos*, 823 F.2d 346 (9th Cir.1987), the defendant was convicted of conspiracy and possession with intent to distribute because the jury accepted the Government's theory that the accused acted as a lookout. *Id.* at 348–51. We reversed because we concluded that the evidence showed that Penagos was a bystander. No evidence was produced from

which it could be inferred that the defendant knew that boxes carried by other persons in his presence contained narcotics. *Id.* at 351.

Castillo's reliance on *United States v. Soto,* 716 F.2d 989 (2d Cir.1983), is equally misplaced. Soto was charged with conspiracy. The Second Circuit concluded that evidence of her mere presence in a residence used as "cutting mill" for the dilution of narcotics for street sales was insufficient to prove that she was a member of a conspiracy to distribute narcotics. *Id.* at 991–93. The Second Circuit held that the circumstances surrounding the defendant's presence in the apartment, the fact that she had just come to New York from Puerto Rico with an infant and had no other place to live alternative, were significant to the issue whether her mere presence indicated participation in the conspiracy. *Id.*

The evidence against Castillo, when viewed in the light most favorable to the Government, demonstrated more than his mere presence at the apartment as a casual invitee. Castillo possessed a key to the outer doors of the apartment complex. A rational jury would logically infer from the fact that Castillo was found in a locked bedroom that he was exercising actual and exclusive dominion and control of the room and its contents. The presence of a gun beneath the mattress directly underneath his body supports an inference that he was prepared to defend his possession of the money and narcotics in the bedroom.

The fact that Castillo's clothing was in the bedroom closet, and his visible agitation concerning the officer's careless handling of the contents of the room during the search, is further demonstration of his possessory interests. In *Williams v. United States,* 418 F.2d 159 (9th Cir.1969), *aff'd,* 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971), we held that evidence that a person arrested in the living room of a residence who thereafter selected clothes from a bedroom closet was sufficient to demonstrate that he had dominion and control over heroin later found on the closet shelf, notwithstanding the absence of any proof that he owned or rented the house. *Id.* at 162–63.

Finally, evidence that cocaine was found in plain view, coupled with the evidence of his physical control of the bedroom, was sufficient to demonstrate knowledge and his dominion and control of all the narcotics found in the bedroom. Our independent review of the evidence has convinced us that any rational jury viewing these facts, and the inferences that can be drawn therefrom, would be persuaded beyond a reasonable doubt that Castillo was knowingly in possession of the cocaine, the handgun, and the money found in the locked second bedroom.

## CONCLUSION

The district court erred in concluding that the affidavit did not establish a substantial basis for the belief that probable cause existed for the arrest of De La Renta. Because we have concluded that the arrest warrant was valid, we affirm the denial of the motion to suppress, without deciding whether the good faith exception to the exclusionary rule applies to defective arrest warrants. Since no error occurred during the trial of this matter, and the evidence of Castillo's guilt was proved beyond a reasonable doubt, the Judgments are AFFIRMED.

NELSON, Circuit Judge, dissenting:

I dissent because I believe that the warrantless search of De La Renta's apartment was not justified by exigent circumstances. A protective sweep without a warrant may be justified by exigent circumstances only if officers reasonably believe that other people might be on the premises who could pose a danger or who could destroy evidence. *See United States v. Whitten,* 706 F.2d 1000, 1014–16 (9th Cir.1983). The officers may not rely on speculation about what circumstances might occur. Rather, they must be able to articulate facts specific to the suspect or the scene of the arrest demonstrating a threat of violence or destruction of evidence before departing from the normal procedure of obtaining a warrant prior to the search. *See United States v. Alvarez,* 810 F.2d 879, 881 (9th Cir.1987); *United*

States v. Spetz, 721 F.2d 1457, 1467 (9th Cir.1983); *see also Arkansas v. Sanders,* 442 U.S. 753, 759–60, 99 S.Ct. 2586, 2590–91, 61 L.Ed.2d 235 (1979). I do not believe that this case presented such exigent circumstances.

The majority intimates that the mild exigency test laid out in *United States v. McConney,* 728 F.2d 1195, 1206 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), might apply to protective sweeps. *Supra* at 1079. *McConney,* however, dealt only with the exigency required to excuse a minor violation of the knock and notice requirement, 18 U.S.C. § 3109: officers' failure, after knocking and identifying themselves, to await refusal of admittance before entering a home to execute valid search and arrest warrants. The mildly exigent circumstances necessary to justify that relatively minor intrusion on a suspect's privacy and liberty is insufficient to excuse a *warrantless* search of a suspect's home such as that which occurred in this case. We have long held that because a warrantless search is "presumptively unreasonable," *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), the government bears a heavy burden of demonstrating that exigent circumstances necessitate entry. " 'It is accepted ... that a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of "exigent circumstances." ' " *Spetz,* 721 F.2d at 1465 (quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 2042, 29 L.Ed.2d 564 (1971)) (emphasis added). "These exceptions are to be 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption ... that the exigencies of the situation made that course *imperative.*' " *Id.* (quoting *Coolidge,* 403 U.S. at 455, 91 S.Ct. at 2032) (footnotes omitted) (emphasis added). "Mild" exigency does not meet this standard.

The police have failed to demonstrate that exigent circumstances justified the protective sweep in this case. They have not articulated specific reasons for believing that someone might be in De La Renta's apartment who could harm them. When asked at the suppression hearing why they conducted a protective sweep, the officers involved gave several answers, none of which seems to me sufficient. One officer stated that he believed a second person might be in the apartment because eleven days prior to the arrest an officer had seen another individual entering De La Renta's apartment. The officer testified that he had no information about who this individual was, whether he had an arrest record, or whether he was armed. A second officer testified, when asked if he had any reason to believe anyone was in the apartment, "[w]e didn't know at that time." The same officer then explained that it is simply "standard procedure to do a protective sweep of the premises ... even if we don't know someone is there, we do it in case somebody's there, obviously."

These statements are insufficient to support a reasonable inference of a threat to the officers' safety. One cannot reasonably infer from witnessing someone once enter an apartment that the person will be present at any random time. The police had no reason to believe that Castillo frequented De La Renta's apartment or that he was present on the day of the arrest.

Our cases have upheld protective sweeps only when police had specific reasons to believe that other individuals were present on the premises at the time of the arrest. *See Whitten,* 706 F.2d at 1016 (disallowing a protective sweep because one officer testified that he "did not know whether anyone else was in the room," and because the officers had "no reason to suspect that any accomplice was in the vicinity."). For example, in *United States v. Valles–Valencia,* 811 F.2d 1232, 1236 (9th Cir.), *amended,* 823 F.2d 381 (1987), we found a protective sweep supported because the police, "having seen two men 'running into the brush' ... reasonably ... believ[ed] that two accomplices remained at large somewhere on the premises." Similarly, in *United States v. Alfonso,* 759 F.2d 728, 742 (9th Cir.1985), we permitted a protective

sweep of a hotel room because several suspects were at large, the hotel manager told the police that several people were in the hotel room, and the police heard "scuffle" noises coming from the bathroom. *See also United States v. Gilbert,* 774 F.2d 962, 964 (9th Cir.1985) (approving a protective sweep because officers believed that defendant was in the company of an armed fugitive, a car not belonging to the defendant was parked in the driveway, and the officers watching the trailer saw movement inside). The facts from which the officers infer a probability of danger must be specific to the suspect or to the scene of the arrest. *See Spetz,* 721 F.2d at 1467 (holding illegal a sweep search following an arrest, when the arrestee had no known confederates, the police could survey all entrances and exits, and "[m]ost significantly, the agents knew of no weapons *connected with any of the individuals arrested or [with] the residence"* (emphasis added)).

In this case, the officers had seen no one else near the apartment for eleven days, and they had no reason to believe that the person seen eleven days before had any criminal connections. They did not see or hear any movement in the apartment prior to beginning the protective sweep other than sounds made by De La Renta. They did not note any signs of another person's presence, such as a car not belonging to De La Renta. In short, they had no articulable reason to believe that anyone besides De La Renta was in the apartment at the time of the arrest.

The majority suggests that several facts not articulated by the officers constitute specific articulable reasons for the protective sweep. First, the majority states that the officers could reasonably infer that De La Renta "was *well known to the DEA* as a cocaine dealer in the Los Angeles area." *Supra* at 1080 (emphasis added). The record, establishing that Agent Lee knew that De La Renta had no criminal record of any kind and was *not* listed in the DEA's computerized file of intelligence information regarding suspected cocaine dealers from all over the world, supports the opposite conclusion. Second, the majority asserts that

the officers could reasonably infer from the facts known to them prior to the entry of De La Renta's apartment that De La Renta was a "principal member" or kingpin of a conspiracy to sell cocaine. *Id.* at 1080–81. The majority bases its conclusion on its belief that De La Renta was "the Colombian national" of whom Malpezzi and Leon previously had spoken to Agent Lee. Again, the record fails to support this conclusion. Lee was told that the Colombian national would meet him; Lee met with Malpezzi and an *unidentified* person, whom Lee said he assumed to be the Colombian national. It was the Colombian national who was identified as a cocaine dealer in the Los Angeles area. Lee had been told that he was to show the buy money to the Colombian at the meeting, but De La Renta didn't say anything at this meeting and left soon after Lee showed up. Lee later showed the money to Leon. Lee assumed incorrectly on the basis of this interaction that De La Renta was the Colombian.

Third, the majority relies on the government's contention that the mention of Malpezzi's bodyguard—Garcia—in Lee's affidavit in support of the arrest warrant reasonably led the officers to believe that Garcia might be waiting in De La Renta's apartment to kill them. This conclusion is the sort of speculation that I believe is not permitted as support for a warrantless search. *See United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985) (stating that the government's burden of demonstrating exigency "is not satisfied by leading a court to speculate about what may or might have been the circumstances."). Lee's affidavit indicated to police that Malpezzi, not De La Renta, had hired Garcia as a bodyguard. It also indicated that the bodyguard was hired only for specific drug transactions. The police had never seen this bodyguard in the vicinity of De La Renta's apartment. They had no reason to believe that he would be there. Malpezzi's statement regarding Garcia therefore is not an articulable fact from which the police might reasonably infer that other dangerous individuals would be present.

Finally, the majority relies on the police officers' expertise in cocaine cases, and suggests that because cocaine dealers tend to carry weapons and resort to violence, the suspicion of danger was justified. I cannot agree. The exigent-circumstances exception to the search warrant requirement mandates specific facts leading the police to fear for their safety. If the general fear that cocaine dealers are violent could fulfill this requirement, we essentially would create a cocaine exception to the search-warrant requirement. Our cases have not yet supported such a broad exception. *See, e.g., United States v. Hatcher*, 680 F.2d 438, 444 (6th Cir.1982) (finding in a heroin case that the protective sweep was not justified merely because the subject of drugs was involved and warning that this reasoning would "permit wholesale abrogation of the Fourth Amendment reasonableness requirement.").

This court previously has recognized the danger of permitting a blanket exception to the fourth amendment without requiring specific circumstances justifying a finding of exigency. Such an exception endangers the constitutional framework. We stated in *United States v. Flickinger*, 573 F.2d 1349, 1355 (9th Cir.1978):

> [W]e are not unsympathetic with the government's premise that "any time agents seek to effect an arrest or search of a residence, with or without a warrant, the possibility that persons inside might have access to weapons is very real and sometimes critical." Followed to its logical conclusion, however, the government's contention would obviate the necessity for a warrant in any arrest in a residence, because every such arrest would involve the potential use of weapons.

Following the insight offered by the *Flickinger* panel, I believe that we should not permit the government to obviate the need for a search warrant in every cocaine-related arrest. Although we must remain sympathetic to the dangers of cocaine investigations, and although the presence of cocaine might increase officers reasonable fears if they have other reasons to believe individuals are present in a residence, a blanket exception to the exigency requirement in all cocaine cases would abrogate the fourth amendment rights of all cocaine suspects.

In this case, I believe that the only articulable reason for conducting the protective sweep was stated clearly by one of the officers: it is "standard procedure to do a protective sweep ... even if we don't know someone is there, we do it." That protective sweeps have become standard procedures suggests that abrogating criminal defendant's fourth amendment rights has also become standard procedure. The Supreme Court repeatedly has held that warrantless searches are presumptively unreasonable, *see, e.g., Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed. 2d 639 (1980), and that exigent circumstance exceptions must be "jealously and carefully drawn." *See Coolidge v. New Hampshire*, 403 U.S. 443, 445, 91 S.Ct. 2022, 2027, 29 L.Ed.2d 564 (1971). If we are to maintain the constitutional presumption by drawing exceptions jealously, then police must articulate a more concrete reason for protective searches than that it is standard procedure in cocaine arrests.

The protective sweep in this case was especially unjustified because De La Renta was arrested in his doorway, where he was quickly handcuffed. The officers have stated no reason for not removing De La Renta from the premises immediately without ever entering his apartment. *Cf. Vale v. Louisiana*, 399 U.S. 30, 33–34, 90 S.Ct. 1969, 1971–72, 26 L.Ed.2d 409 (1970); *Whitten*, 706 F.2d at 1016 (stating that "if a search is to be upheld as incident to an arrest, the arrest must take place inside the house."). An arrest accomplished outside the premises permits a protective sweep only in the rare circumstance that the arresting officers have a specific reason to believe that their safe retreat is not possible. *Compare United States v. Astorga–Torres*, 682 F.2d 1331 (9th Cir. 1982) (finding protective sweep justified because officers had been fired upon from several locations in the house before arresting the defendant as he emerged) *with United States v. Spetz*, 721 F.2d 1457 (9th

Cir.1983) (finding protective sweep unjustified because suspects were unarmed when they were arrested outside the house). Even if the circumstances in this case raise articulable fears that would justify a protective sweep to protect officers inside the apartment, because the officers needn't have entered the apartment at all, the protective search was not justified. *See Driver,* 776 F.2d at 810 (stating that agents would not have feared for their safety if they had not first impermissibly entered the building).

Because I believe that the protective sweep violated the constitutional warrant requirement, I would reverse the convictions, and would exclude evidence seized during the sweep from any retrial. I would also exclude any evidence seized later during the search based on consent, because in this case, De La Renta's consent to search came as the direct result of exploiting the results of the protective sweep. *See Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975). Even assuming that the consent was voluntary, the permission came within minutes of the illegal search, and no intervening circumstances served to attenuate the taint. *See id.* at 603–04, 95 S.Ct. at 2261–62; *United States v. Perez–Esparza,* 609 F.2d 1284, 1289 (9th Cir.1979). Because the government has not demonstrated attenuation, *see United States v. Taheri,* 648 F.2d 598, 601 (9th Cir.1981), I would exclude evidence seized after the consent.