**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph CARBAJAL, Jr., Defendant–Appellant.**

No. 89–50507.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 3, 1991.

Decided Feb. 14, 1992.

Carol Klauschie and Korey House, Deputy Federal Public Defenders, Los Angeles, Cal., for defendant-appellant.

Karin J. Immergut, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before GOODWIN, PREGERSON and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Joseph Carbajal, Jr. appeals from the judgment of conviction following a trial by jury for armed robbery in violation of 18 U.S.C. § 2113(a)(d), and for carrying a firearm during a violent crime in violation of 18 U.S.C. § 924(c)(1).

Carbajal seeks reversal on the following grounds:

One. The district court erred in denying his suppression motion because he was arrested without probable cause.

Two. The district court erred in determining that Katilleen Pyne consented to the search of her residence.

Three. The district court erred in ruling that the photospread shown to the bank teller was impermissibly suggestive.

We conclude that the district court failed to state its essential findings on the record as required by Rule 12(e) of the Federal Rules of Criminal Procedure and vacate the denial of the motion to suppress with directions. We affirm the district court's ruling that the in-court identification was admissible.

## I.

### PROCEDURAL AND FACTUAL BACKGROUND

On December 30, 1988, at approximately 3:45 p.m., two men robbed the Torrance branch of Wells Fargo Bank. A bank customer informed officers of the Torrance Police Department that the robbers left the bank in a white van bearing California License Number 2N54799. The eyewitness also noticed that the rear window of the van was missing. The officers discovered through official channels that a white Ford van with that license number was registered to Katilleen Pyne. Katilleen Pyne's current address was 428 North Bandini, San Pedro, California.

Two Torrance Police Department officers drove to Pyne's Bandini street residence. They observed Pyne's van parked approximately 15 yards away from 428 North Bandini.

The officers conducted a surveillance of the area for approximately five hours. During that time the officers saw a black Ford car pull up in front of 428 North Bandini. The driver matched the description of one of the robbers of the Torrance branch of the Wells Fargo Bank. A woman alighted from the car, entered the residence, and returned a few minutes later. The driver drove the car away.

At approximately 6:15 p.m., the officers saw Carbajal leave the Bandini Street residence with two women. They entered a red car which was parked in front of Pyne's white Ford van. The car was driven to 11th and Pacific. There Carbajal walked up to the bank robbery suspect who earlier had been observed parked in front of 428 Bandini in a black Ford car. The women remained in the car. The two robbery suspects spoke to each other briefly and then entered the bar. About 5 minutes later, Carbajal left the bar and drove the red car back to the residence at 428 North

Bandini. Carbajal and the two women entered the house. At approximately 9:30 p.m. Carbajal left the residence. He was arrested as he entered the red car.

Carbajal was indicted on February 9, 1989. On March 15, 1989, Carbajal filed a motion to suppress evidence obtained "as a result of the warrantless search of his girlfriend's house."

At the suppression hearing, the Government submitted the declarations of Sergeant Dennis Addington and Detective Steven Boutwell of the Torrance Police Department. In his declaration, Sergeant Addington stated that as he parked his police car to arrest Carbajal, the suspect got out of the car and turned toward the house as if to flee. Carbajal was then handcuffed and told he was under arrest for bank robbery. Moments later, the front door of the residence at 428 North Bandini was opened. A woman came outside. Sergeant Addington saw other persons moving about in the house. He asked them to come outside.

Sergeant Addington entered to determine whether there were any other persons in the house. After conducting a protective sweep of the house, Sergeant Addington returned to the front of the house, and spoke to a person who identified herself as Katilleen Pyne.

Sergeant Addington's declaration contains the following recitation of facts concerning his encounter with Pyne.

I explained to Ms. Pyne that we were police officers and that we were there investigating a bank robbery. I also told her that we believed that her van was used in the robbery. Ms. Pyne said that she had lent the van to the defendant, her boyfriend, and that "Joe" had returned it just before dark. She further stated that the defendant stays with her sometimes at 428 Bandini, in her daughter's room, and that he keeps his personal belongings in her daughter's bedroom closet. She further stated that she paid the rent for the residence.

I then told Ms. Pyne that we wanted to search her house for evidence of the bank robbery and asked whether she would give us her written consent. I further told her that she was not required to give us consent. She stated, "Yeah, go ahead and look anywhere you want."

The declaration also alleges that Sergeant Addington reentered the house and searched the bedroom closet. He found a plastic bag. The bag contained a blue steel revolver, a nickle-framed automatic pistol, a blue Pendleton shirt a black curly long wig, several dark watch caps, a pair of gloves, and an imitation Gucci brown zipper pouch. In a hall closet, Sergeant Addington found a green strong box containing a small amount of cocaine and numerous clear ziplock baggies.

Thereafter, Pyne was placed under arrest and taken to the police station. At the police station, Pyne was asked to sign a consent form because Sergeant Addington did not have any consent-to-search forms at the time Pyne orally consented to the search. Sergeant Addington also alleged that later that day, "another officer inadvertently asked Ms. Pyne to sign a second consent form, which she did."

Detective Boutwell's declaration contains a recitation of his investigation of the robbery of the Torrance branch of the Wells Fargo Bank. He received the description of the bank robbers and the license number of the van from a young man in the bank. Detective Boutwell's declaration does not contain any facts regarding the events that followed Carbajal's arrest.

The court granted Carbajal's request that Sergeant Addington be called to testify so that his attorney could cross-examine him. Sergeant Addington was questioned concerning the surveillance and the arrest of Carbajal. He was not asked any questions concerning the substance of his conversation with Pyne or whether it was made under coercive circumstances. The entire cross-examination of Sergeant Addington concerning Carbajal's arrest and the conversation with Pyne appears in the following colloquy:

Q The arrest took place approximately 10:20 p.m.; is that correct?

A That's incorrect.

Q What time was it?

A Approximately 9:30. I believe 9:30, yes.

Q Any efforts made to obtain an arrest warrant?

A No, ma'am.

Q Why not?

A Didn't feel it was necessary.

Q When Mr. Carbajal came out of the house before 9:30, did the officers draw their guns?

A Yes, ma'am.

Q All of the officers?

A I believe so.

Q There were children present; isn't that true?

A Not at that point in time, it's not true.

Q At some point in time, were there children present?

A Yes, ma'am.

. . . .

Q The conversation with Ms. Pyne that you've noted in your direct examination, was that taped?

A No, ma'am.

Q Did you take notes?

A No.

Q You didn't write the report in this case; isn't that true?

A That is true.

MS. KLAUSCHIE: Nothing further, Your Honor.

After Sergeant Addington was excused, Carbajal called Pyne as a defense witness. Pyne testified that she did not speak to Sergeant Addington, and did not consent to a search of her house. She did not see any of the officers come out of the house carrying anything in their hands. She testified further that at the station house, she signed a consent form because she was told it was for the search of her van. She testified that she was assured that the consent form did not authorize a search of the house. She stated that she was told that she would be notified prior to any search of her house and she "would have to be present."

Pyne described her initial encounter with the Torrance Police Department as follows:

When I got to the door, there's just a bunch of people screaming at me to come out, lie on the ground. They all had guns to my head. I just screamed back that it was just me and the children inside the house and we went outside and laid on the floor. I got [my sons, ages 12 and 6] and my youngest one underneath me.

. . . . .

Then we were outside on the ground and they had guns to me—to all of us. And then the police went in.... They kept the guns to our heads.

. . . . .

We just laid on the ground and then—I wasn't laying, I was more on my knees, down on my knees. And I had my little boy like kind of under me. And then they stayed with the gun to my head and we sat out there.... And then they had [appellant] over to the side and they were hitting him. And then when I was looking more over, the man in front of me got the gun closer into my head and had me turn my head. Told me if I turned my head again, he would shoot. I kept still watching over there and they were just basically just beating, hitting him.

And then they told us we could get up and then a neighbor of mine, she came. She was screaming. They were all screaming at her to get back, to stop. She still kept coming and she was—I was telling her to stop 'cause they were going to shoot us if she didn't stop.

. . . . .

I'd say anywhere from seven to ten people [were yelling and screaming]. And then there was just a lot of commotion. There was just people running, like, on the sidewalk and the guy had the gun a little bit closer into me.

. . . . .

It was just like we were being invaded.... And then at that point I had asked them, 'Do you have a warrant or anything?' And somebody else came at me.... he came cussing at me, 'F-in'

warrant' and 'You're F-in this, and just basically screaming at me.

. . . . .

They tore the house apart.... Five with me and just questioning me and yelling and screaming and cussing. And just basically mostly cussing every time I would try to say something.

. . . . .

When we were outside, like I said, there was about six of them, seven of them. The only thing that they kept screaming at me, that I had done a bank robbery.

. . . . .

They just cussed at me every other word or every word was F-you this, and I was a drug addict, my mother was a drug addict, I was a prostitute and that it was true....

On cross-examination, Pyne testified that Carbajal had been her boyfriend for 10 months and that he was the father of her as yet unborn child.

Following Pyne's testimony, Sergeant Addington was called as a witness by the Government. He testified that after the arrest of Carbajal, he ordered everyone out of the house at gunpoint because an additional bank robbery suspect was at large. He then determined, after a cursory search of the house, that there were two females and two children.

After the sweep search was completed, Sergeant Addington explained to Pyne that Carbajal had been arrested for suspicion of bank robbery. Pyne informed Sergeant Addington that she had loaned her van to Carbajal. Carbajal returned the van shortly before dark.

Sergeant Addington testified that he then asked Pyne for her written consent to search her residence for evidence of a bank robbery. Pyne replied: "Yes, go ahead, look if you want." Sergeant Addington testified that he did not get her written consent at that time because he did not have any forms with him. Sergeant Addington testified further that none of the officers called Pyne a drug addict or a prostitute. Sergeant Addington was not questioned by the prosecution or defense counsel concerning Pyne's testimony that 7 to 10 officers "screamed" at her and made her and her children kneel on the ground with guns pointed at her head.

After this testimony, both sides rested. Carbajal's attorney argued that the Government had not "met their burden whether a consent was given." Counsel argued further that: "[Pyne] was sure that she had never been asked whether there was permission to enter her house. *So no permission was given.*" (emphasis added).

Carbajal's trial counsel did *not* argue that Pyne was coerced into giving her oral consent to the search of her residence because the officers pointed a gun at her head and made her kneel on the ground.[1]

---

1. Carbajal's counsel's entire argument on the consent issue reads as follows:

MS. KLAUSCHIE: Your Honor, it is the Government's burden to prove by a preponderance of the evidence that a consent is voluntary. First of all, I don't think they have met their burden as to whether a consent was given.

Secondly, if even it could have been voluntary, in any event, the waiver doesn't cure the prior illegal entry. As I indicated earlier, there was nothing to prohibit these officers from going through the necessary steps of getting an arrest warrant from a Magistrate to take the proper precautions to having whatever forms they needed available.

They were surveilling this location for a good five to six hours and there were plenty of them, because they were able—as is indicated by the evidence, they were able to (undecipherable) and do various tasks while some of them remained at the location.

The Government has attempted to impeach Ms. Pyne by statements of the officer. Well, the officers' statements are certainly self-serving, as any statement she may have made could be argued to be.

She described that the conversations she recalls seemed to be quite frantic, with people coming at her from all directions, making accusations, asking her questions. At one time she had tried to respond to one person only to have another ask her something else, and that she's not sure, quite frankly, what was asked or what she said. But she was sure that she had never been asked whether there was permission to enter her house. So no permission was given.

It's also clear the officers did assert they did obtain several items and that those items are proffered by the Government as evidence in its case in chief.

The court found that Pyne consented to the search. In explaining its ruling, the court commented as follows:

> I think that the young lady does have a reason to protect her boyfriend and to protect herself; [she] is carrying his child, for that matter. And though she may have given her consent under some pressure, I think that the evidence warrants that she gave it. And that is strengthened by the fact that at some later time when she was asked to sign a written consent, that she was told what it was and had the opportunity to read it and that she did sign it not once but twice.
>
> So the weight of the evidence falls over on the prosecution's side in the question of consent. And I think that the motion for the suppression of a warrantless seizure must be denied.

The district court did not make any finding regarding whether Pyne's consent was voluntary.

## II.

## DISCUSSION

### 1. *Arrest Without Probable Cause*

We do not address Carbajal's argument that his arrest lacked probable cause. Carbajal's attorney conceded at oral argument that no evidence was seized from Carbajal's person or outside the Bandini residence as an incident to his arrest.

### 2. *Photospread Identification*

■ Carbajal argues that the photospread shown to the bankteller, Jackie Pope, was impermissibly suggestive because he was the only person in the photospread who was wearing a wig and had bruises on his face. Carbajal asserts that the district court erred in admitting testimony concerning the witness' identification of him in the photospread and her in-court identification.

The photospread was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). We have examined the photospread. All six of the pictures in the photospread were of Hispanic males in the same age range, with similar skin, eye, and hair coloring. Each had approximately the same hair length. Each had a moustache. The fact that Carbajal is the only person in the photospread with discernible bruises on his face is insufficient to give rise to a very substantial likelihood of misidentification. If anything, the bruises may have made identification more difficult because they distorted his features. The district court did not err in admitting testimony that Pope identified Carbajal in this photospread.

■ Similarly, the fact that Pope saw Carbajal at an earlier court proceeding is insufficient to require that the evidence be suppressed. An in-court identification is admissible, if it is reliable, notwithstanding the fact that there may have been a suggestive exposure to the defendant. *See Manson v. Brathwaite*, 432 U.S. 98, 109–114, 97 S.Ct. 2243, 2250–53, 53 L.Ed.2d 140 (1977). In determining whether an eyewitness' in-court identification is reliable, a reviewing court must consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

The record supports the district court's conclusion that the in-court identification was reliable. Pope testified that she got a "good look" at the robber for approximately 30 seconds while he stood "a couple of feet" away from her. She also testified that when she saw Carbajal, she was certain that he was the robber. The district court did not abuse its discretion in admitting Pope's in-court identification of Carbajal. *See United States v. Gregory*, 891 F.2d 732, 734 (9th Cir.1989) (admission of in-court identification evidence is reviewed for abuse of discretion).

### 3. Search of the Bandini Residence

■ Carbajal argues that Pyne did not consent to a search of the Bandini residence and that even if Pyne did consent, her consent was involuntary.[2] As set forth above, Sergeant Addington and Pyne gave two very different accounts of the events leading to the search of the residence. The district found that Sergeant Addington's testimony that Pyne consented was credible. The district court made no finding concerning the voluntariness of Pyne's consent or whether Pyne's description of the events was truthful.

■ The Fourth Amendment incorporates a strong preference for search warrants. *United States v. Ventresca,* 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965). Warrantless searches are *per se* unreasonable. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). While warrantless searches are not absolutely prohibited, the exceptions to the warrant requirement are "jealously and carefully drawn." *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958).

■ The burden is on the Government, moreover, to show the reasonableness of a warrantless search. 4 W. LaFave, *Search and Seizure* 218 (2d ed. 1987). This includes demonstrating that the search comes within one of the narrow exceptions to the warrant requirement. *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951). In this matter the Government has the burden of proving that consent to a warrantless search was voluntary. *United States v. Kaplan,* 895 F.2d 618, 622 (9th Cir.1990); *United States v. Al-Azzawy,* 784 F.2d 890, 895 (9th Cir. 1985), *cert. denied,* 476 U.S. 1144, 106 S.Ct. 2255, 90 L.Ed.2d 700 (1986). Whether consent to a search was voluntary, or was the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 248–49, 93 S.Ct. 2041, 2047, 2058–59, 36 L.Ed.2d 854 (1973); *See Al-Azzawy,* 784 F.2d at 895 ("Voluntariness is a question of fact to be determined from all the surrounding circumstances.").

■ While Carbajal's trial counsel did not argue before the district court that Pyne consented involuntarily, his lawyer alerted the court that it is the Government's burden to prove that consent is voluntary by a preponderance of the evidence. Because the district court made no findings on the impact of the seizure of Pyne at gunpoint by the officers, or whether she was required to kneel or lie down while the protective sweep was being conducted, we cannot determine from the present record whether the court found that these factors did or did not affect the voluntariness of her consent.[3]

Defense counsel's theory in the district court was that Pyne testified truthfully that she did not give her consent. The Government prosecutor, however, forthrightly informed the court that "the issue to address is whether there was authorized and voluntary consent, voluntariness being the issue." Unfortunately, the district court did not make a finding on this dispositive issue.

Rule 12(e) of the Federal Rules of Criminal Procedure, which governs motions to suppress, requires, in pertinent part, that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." In *United States v. Prieto–Villa,* 910 F.2d 601 (9th Cir.1990), we held that pursuant to Rule 12(e), it is inappropriate, in reviewing an order denying a motion to suppress, for an appellate court to attempt to resolve disputed factual questions, or to search the record for support for the Government's

---

2. It is unclear from the record whether Carbajal had a reasonable expectation of privacy in the Bandini residence. Since the Government has not raised the issue on appeal, it is waived. *See United States v. Wanless,* 882 F.2d 1459, 1462 (9th Cir.1989).

3. Among the factors that should be weighed in determining whether consent is voluntary are:

(1) whether the person was in custody; (2) whether the arresting officers have their guns drawn; (3) whether Miranda warnings have been given; (4) whether the person was told she has a right not to consent; and (5) whether the person was told a search warrant could be obtained. *United States v. Castillo,* 866 F.2d 1071, 1082 (9th Cir.1989).

position as the prevailing party. *Id.* at 607. We concluded in *Prieto–Villa* that "factual findings by the district court are mandatory and that remand is therefore required." *Id.*

■ In this matter, it would be violative of Rule 12(e) for this court to make a factual finding, in the first instance, that Pyne's consent was voluntary or involuntary. That determination must be made by the district court. Accordingly, we vacate the order denying the motion to suppress and remand with directions that the district court make express findings regarding (1) whether Pyne's testimony concurring the events following the arrest of Carbajal is truthful; (2) whether Pyne voluntarily consented to a search of her residence, and (3) any other finding that will assist this court in resolving the issues presented by the motion to suppress. The district court, in its discretion, is free to conduct a further evidentiary proceeding, and, if appropriate, to reconsider its ruling on the motion to suppress.

VACATED and REMANDED with directions.

PREGERSON, Circuit Judge, dissenting.

I dissent. The majority states that there is insufficient evidence to determine whether Pyne consented to the search of her home. The record is clear that Pyne did not voluntarily consent to the search. A remand on this issue is unnecessary.

At the suppression hearing, Pyne emphatically maintained that she never gave verbal or written consent to a search of her home. She testified that her signature on the consent forms produced by the government was neither knowing nor voluntary. Pyne testified that the forms were not completed when she signed them; that she believed the forms were for the search of her impounded van, not her home; and that she signed the forms unwillingly. The government offered *no* evidence to counter Pyne's version of the events surrounding the signing of the forms, nor did the government offer any explanation as to why the address of the residence was filled in *after* Pyne signed the forms.

Pyne's testimony—which was not negated—further indicates that any consent she may have given was vitiated by the coercive and terrifying tactics the police used in seizing Pyne and her children. Pyne described the encounter as follows:

When I got to the door, there's just a bunch of people screaming at me to come out, lie on the ground. They all had guns to my head. I just screamed back that it was just me and the children inside the house and we went outside and laid on the floor. I got [my sons, aged 12 and 6] and my youngest one underneath me.

. . . . .

Then we were outside on the ground and they had guns to me—to all of us. And then the police went in.... They kept the guns to our heads.

. . . . .

We just laid on the ground and then—I wasn't laying, I was more on my knees, down on my knees. And I had my little boy like kind of under me. And then they stayed with the gun to my head and we sat out there.... And then they had [the defendant] over to the side and they were hitting him. And then when I was looking more over, the man in front of me got the gun closer into my head and had me turn my head. Told me if I turned my head again, he would shoot. I kept still watching over there and they were just basically just beating, hitting him.

. . . . .

It was just like we were being invaded.... And then at that point I had asked them, 'Do you have a warrant or anything?' And somebody else came at me.... he came cussing at me, 'F-in' warrant' and 'You're F-in this,' and just basically screaming at me.

. . . . .

They tore the house apart.... Five with me and just questioning me and yelling and screaming and cussing. And just basically mostly cussing every time I would try to say something.

. . . . .

When we were outside, like I said, there was about six of them, seven of

them. The only thing that they kept screaming at me, that I had done a bank robbery.

.    .    .    .    .

They just cussed at me every other word or every word was F-you this, and I was a drug addict, my mother was a drug addict, I was a prostitute and that it was true....

The government has the burden of proving Pyne's consent was voluntary. *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir.1990). Whether consent to a search was voluntary, or was the product of duress or coercion, is a question of fact to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 248–49, 93 S.Ct. 2041, 2058–59, 36 L.Ed.2d 854 (1973). Among the factors we consider in determining whether consent is voluntary are: (1) whether the person was in custody; (2) whether the arresting officers have their guns drawn; (3) whether Miranda warnings have been given; (4) whether the person was told she has a right not to consent; and (5) whether the person was told a search warrant could be obtained. *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir.1988).

Pyne was clearly in custody at the time the police initially searched her home. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1979). The police officers not only had their guns drawn, they had them pointed at Pyne's head and at her children, who were huddled on the ground. *See United States v. Al–Azzawy*, 784 F.2d 890, 895 (9th Cir. 1985). One officer allegedly threatened to shoot Pyne if she turned her head. Pyne testified that the officers were beating the defendant nearby, and that they shouted and swore at her.

Although Sergeant Addington testified that he told Pyne she had the right not to consent to a search of her residence, there is no evidence that any Miranda warnings were given at the time. There is also no evidence that the police told Pyne that a search warrant could be obtained. Under the totality of the circumstances, even if Pyne did consent at the time of the ar-

rest—which she flatly denies—the government in my view has not shown that her consent was voluntary. *See Schneckloth*, 412 U.S. at 249, 93 S.Ct. at 2059 (government must "demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied").

Although the district court ruled that the evidence indicated that Pyne gave consent, the court never found that Pyne's consent was voluntary. In fact, the district court acknowledged that Pyne "may have given her consent under some pressure."

The government has failed to meet its burden of showing that Pyne's consent was voluntarily given and was not the product of duress or coercion. The search of Pyne's home was undertaken with undue force and intimidation. Her consent was not voluntarily obtained. Submission to police coercion is not consent. Though the acquisition of evidence is vital to the effective administration of justice, evidence must not be obtained in violation of an individual's right to be secure in her own home. The officers clearly abused their authority when entering Pyne's home without her consent.