**UNITED STATES of America, Plaintiff,**

**v.**

**Arturo RUESGA-RAMOS, Defendant.**

**No. CR-92-278-FVS.**

United States District Court,
E.D. Washington.

March 5, 1993.

Antonio Salazar, Salazar Law Offices, Pasco, WA, for defendant.

Stephanie Johnson, U.S. Attorney's Office, Spokane, WA, for U.S.

## AMENDED ORDER DENYING MOTION TO SUPPRESS FRUITS OF VEHICLE SEARCH

VAN SICKLE, District Judge.

BEFORE THE COURT is the defendant's motion to suppress (Ct.Rec. 29). It was heard on January 28, 1993, and February 3, 1993. The defendant and his attorney, Antonio Salazar, were present throughout. The government was represented by Assistant United States Attorney Stephanie J. Johnson. Thomas LaVigne was the interpreter.

## I. BACKGROUND

Thomas B. Kipp is employed as a trooper for the Oregon State Police. He is assigned to the Bend office. On May 2, 1992, Trooper Kipp began work at about 7:00 a.m. Over the next several hours, he made five traffic stops prior to the one at issue here. Three were for speeding; two were for equipment violations. Of the five motorists, only two were cited. The other three were issued verbal warnings.

At about 10:20 a.m., Trooper Kipp was northbound on U.S. 97 near Redmond, Oregon. He spotted Arturo Ruesga–Ramos (hereinafter "Ruesga") driving south in a Ford Thunderbird with Washington plates. In Kipp's opinion, Ruesga matched the drug courier profile developed by the Oregon State Police. Ruesga was driving a high-performance vehicle; his vehicle had out-of-state license plates; the vehicle was well maintained; the vehicle was traveling at (or slightly below) the speed limit; the vehicle had a single, male occupant; and the occupant appeared to be of Hispanic origin. Because of those factors, Kipp turned around and began to follow Ruesga.

Shortly thereafter, Trooper Kipp observed Ruesga's vehicle cross the fog line, then the center line. Based upon the lane violations, Kipp pulled Ruesga over. The stop took place in a comparatively isolated area approximately two miles north of Redmond.

Kipp contacted Ruesga, who produced a driver's license and vehicle registration. Trooper Kipp took the documents back to his car where he ran a routine check. Ruesga's license was valid.

After concluding the license check, Kipp turned off his vehicle's overhead lights. (He left the yellow flashers on for safety, but they show only to the rear.) Kipp then walked back to Ruesga's car and issued a verbal warning regarding the lane violations. After doing so, he told Ruesga he was free to go.

At that point, Ruesga started his car and put on his seatbelt. Kipp took a step or so in the direction of his vehicle. He then turned back toward Ruesga and asked Ruesga whether he could ask a few more questions. Ruesga agreed.

Kipp asked Ruesga about his destination. Ruesga got out and the two began to talk by the side of Ruesga's car. Because of passing traffic, Kipp suggested that they move between the two vehicles (which they did).

Eventually, Trooper Kipp asked Ruesga if he had any drugs or large sums of cash in his car. Ruesga denied that he did. Kipp then asked if he could look in the car, and Ruesga

agreed. Ruesga got the keys out of the ignition; opened the trunk; and unlocked the door on the passenger's side.

Before conducting the search, Trooper Kipp asked Ruesga whether he had any guns, narcotics or cash on his person. Ruesga denied having a gun, but said he did have about $2,500 in cash. Kipp asked Ruesga for permission to conduct a pat down, and Ruesga agreed. During the pat down, Kipp found two bundles of money wrapped in rubber bands. The bundles appeared to contain the sum indicated by Ruesga. After briefly examining the bundles, Kipp returned them to Ruesga.

Trooper Kipp asked Ruesga if he would stand approximately ten feet in front of his Thunderbird while Kipp conducted the search. Ruesga said, "Okay," and went to the suggested spot. Trooper Kipp then searched the vehicle.

While inspecting the trunk, Kipp noticed a plastic bag under the spare tire cover. Kipp could see that it contained bundled money. After speaking to Ruesga, Kipp learned that the bag contained approximately thirty-five thousand dollars. Kipp called for backup.

Within a few minutes, Redmond police officer Kenneth Kerfoot arrived.[1] Trooper Kipp then resumed his examination of the trunk. As he did so, he observed a four inch by five inch hole on the left side of the trunk just forward of the wheel well. By shining a flashlight inside the hole, Kipp could see a cavity which was full of bundled money. Kipp was unable to pull any of the bundles out, so he asked Officer Kerfoot to try. Kerfoot retrieved a number of bundles.

Trooper Kipp told Ruesga that he wanted to go back to his office to count the money; Ruesga said he understood. Ruesga asked that he be given a receipt for the money counted.

By this time, the other officers were getting ready to leave. Kipp told Ruesga that "he would be free to follow" if he didn't know the way. Kipp and Ruesga then got into their cars and Kipp led the way to his office in Bend, Oregon, which was approximately twenty miles away. Officer Kerfoot followed as far as Redmond, where he turned off.

Kipp and Ruesga arrived in Bend about noon. Once there, Ruesga locked the car, retaining possession of the car keys. Kipp and Ruesga then proceeded to the squad room. Ruesga sat at a table while Kipp and another trooper went into an adjacent office to count the money.

Ruesga was not restrained in any way while the money was being counted. Nor was the area in which he was sitting secure. Had he chosen to do so, he could have walked out of the building unhindered.

It took about thirty minutes to count the money. The troopers then asked a local police officer to bring a trained dog to sniff the money. The dog reacted to the presence of controlled substances.

Trooper Kipp asked Ruesga if the police officer could search Ruesga's car with her dog. Ruesga agreed. Ruesga went to his car, unlocked it, and allowed the dog to sniff inside. The dog reacted to the presence of controlled substances.

At about 1:30 p.m., Kipp told Ruesga that he intended to seize the money. He asked Ruesga how much money should have been uncovered. "Over $100,000," Ruesga replied. Kipp indicated the troopers had counted only $69,600. Given the discrepancy, he asked Ruesga whether they could look in Ruesga's car. Once again, Ruesga unlocked the car and opened the trunk.

The troopers began another search of Ruesga's car. During the process, a trooper got his arm stuck attempting to retrieve bundles of money from the small compartment just forward of the left rear wheelwell. Ultimately, firefighters from the Bend Fire Department had to be summoned to extricate the trooper.

In the meantime, Trooper Kipp and Ruesga went back inside the office. Ruesga told Kipp that there was an easier way to get the money from the compartment. According to Ruesga, all the troopers had to do was remove some screws, take a seatbelt off, and they could reach the money from the interior

1. Later, a deputy sheriff appeared at the scene.

of the car. In fact, Ruesga volunteered to show Kipp how to do it. Ruesga went out to his car; took some tools; and retrieved another batch of money from the compartment.

The troopers began counting this new batch of money about 3:15 p.m. As they did so, certain small crystals dropped out of several bundles. Based upon his training and experience, Kipp concluded the crystals were cocaine. Kipp put the crystals in separate "paper folds," and arranged for the police dog to sniff them at about 5:35 p.m. The dog reacted to the presence of a controlled substance.

The troopers finished counting the money, which totaled $351,000. At approximately 6:20 p.m., Ruesga was informed that he was no longer free to go. He was then advised of his *Miranda* rights.

Later that evening, Ruesga was taken to the jail where he was booked. However, he was allowed to post bail with the money which he was carrying on his person at the time of the traffic stop.

Ruesga now moves to suppress the fruits of the vehicle search. He argues that Trooper Kipp used a minor traffic violation as a pretext for a stop whose true purpose was a drug investigation. Next, he contends he was improperly detained after the purpose for the stop had come to an end. Finally, he submits that his various consents to search were not given voluntarily.[2]

## II. VALIDITY OF STOP

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court created a "limited exception to the rule that seizures of the person require probable cause." *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). Certain seizures (now commonly referred to as "*Terry* stops") are permissible under the Fourth Amendment if "there is an articulable suspicion that a person has committed or is

about to commit a crime." *Id.* at 498, 104 S.Ct. at 1324.

■ A traffic stop is analogous to a *Terry* stop. *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). Like a *Terry* stop, a traffic stop must be justified at its inception; it must be temporary; and it must last no longer than is necessary to effectuate the purpose of the stop. *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).

### A. Test for Determining Pretext

■ A law enforcement officer may not use an otherwise valid traffic stop as a pretext for a search. *See United States v. Lillard*, 929 F.2d 500, 502 (9th Cir.1991); *United States v. Smith*, 802 F.2d 1119, 1124 (9th Cir.1986). Although that much is agreed, the standard for determining whether a stop is pretextual is very much in dispute.

The Eighth, Seventh, and Fifth Circuits have held that a traffic stop is not pretextual if the officer who made the stop had a reasonable suspicion that an infraction was being committed. *United States v. Cummins*, 920 F.2d 498, 500–01 (8th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Trigg*, 878 F.2d 1037, 1041 (7th Cir.1989), *cert. denied*, — U.S. —, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991); *United States v. Causey*, 834 F.2d 1179, 1184–85 (5th Cir.1987) (en banc). In other words, " 'so long as the police are doing no more than they are legally permitted and objectively authorized to do, [the resulting stop or] arrest is constitutional.' " *Cummins*, 920 F.2d at 501 (quoting *Trigg*, 878 F.2d at 1041).

The Tenth and Eleventh Circuits have held that the question is not whether an officer could have legally stopped the car, but whether a reasonable officer would have made the seizure in the absence of illegiti-

---

2. Co-defendants Vidal Chavez and Eleazar Bustos–Salgado attempted to join Ruesga's motion to suppress. However, as explained in the Order Denying Motion to Suppress Firearms, neither Chavez nor Bustos has demonstrated that he exercised control over Ruesga's vehicle on this trip, or that he had a direct interest in the money

which was discovered therein. Thus, neither Chavez nor Bustos has standing to contest the seizure of money from Ruesga's vehicle. *See United States v. Padilla*, 960 F.2d 854, 861 (9th Cir.), *cert. granted*, — U.S. —, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992).

mate motivation. *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988); *United States v. Smith,* 799 F.2d 704, 708 (11th Cir.1986). In the Tenth Circuit, an important factor in making that determination is whether officers "are required to and/or do routinely" stop other motorists under similar circumstances. *Guzman,* 864 F.2d at 1518.

The Sixth Circuit has cited the Eleventh Circuit's *Smith* opinion with approval, although it is unclear whether it has fully embraced *Smith* 's reasoning. *United States v. Crotinger,* 928 F.2d 203, 206 (6th Cir.1991) (finding *Smith* "helpful"). For its part, the Fourth Circuit has acknowledged the split, but declined to choose between the two approaches. *United States v. Rusher,* 966 F.2d 868, 876 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992).

Both of the approaches described above are self-consciously objective in nature. Although they utilize different criteria in determining whether a stop is pretextual, they avoid inquiry into an officer's state of mind. Proponents of both views agree that an officer's subjective expectation that he may find contraband during the course of the stop is irrelevant as long as his actions are objectively reasonable. *Compare Cummins,* 920 F.2d at 501 *with Guzman,* 864 F.2d at 1517–18.[3]

The Ninth Circuit, by contrast, has suggested a more subjective test. It has said that the question of pretext "turns on the motivation or primary purpose of the arresting officers." *Smith,* 802 F.2d at 1124. *See also United States v. Huffhines,* 967 F.2d 314, 317 (9th Cir.1992) (following *Smith* ); *United States v. Gutierrez–Mederos,* 965 F.2d 800, 802 (9th Cir.1992) (same), *cert. denied,* —— U.S. ——, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993). Thus, in the Ninth Circuit, "[a] search is pretextual when 'the motivation or primary purpose of the arresting officers' is to arrest a defendant 'for a minor offense so as to allow police to search for evidence of some other unrelated offense for

which police lack probable cause to arrest or search.' " *United States v. Mota,* 982 F.2d 1384, 1386 (9th Cir.1993) (quoting *Smith,* 802 F.2d at 1124).

*Smith* did not involve a traffic stop, however. The issue was whether officers had delayed a suspect's arrest so that they could catch him with drugs on his person. 802 F.2d at 1123–24. Two more recent decisions illustrate this circuit's approach to the question of allegedly pretextual traffic stops.

In *Lillard,*[4] the defendant was believed to be manufacturing methamphetamine. As a result, law enforcement officers placed his residence under around-the-clock surveillance. 929 F.2d at 501. At some point after surveillance began, Mr. Lillard left his home in a van. He was followed by three officers in two cars. They observed him driving 70 to 75 m.p.h. in a 55 m.p.h. zone, and they saw him skid around a corner. 929 F.2d at 501.

Lillard was stopped by an officer who approached the van with his gun drawn. At a subsequent suppression hearing, the officer testified "that he stopped the van because [Lillard] was speeding and driving carelessly, and was suspected of manufacturing methamphetamine." 929 F.2d at 501–02.

Notwithstanding the officer's apparently mixed motives, the Court of Appeals upheld the stop. Although the officer suspected methamphetamine manufacturing, the officer testified that he would have stopped Lillard in any event based upon his driving. 929 F.2d at 502.

In *Gutierrez–Mederos,* an Oregon State Police trooper pulled the defendant over for tailgating another vehicle and for failing to signal a lane change. After some discussion between the trooper and the defendant, the trooper asked the defendant and his companion "whether they had any drugs or weapons in the car. Each responded in the negative." 965 F.2d at 802. The trooper then asked for permission to search the car, and the defen-

---

3. Although Professor LaFave supports the approach adopted by the Tenth and Eleventh Circuits, he agrees that sending federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources. 1 W. LaFave, *Search and*

*Seizure,* § 1.4(e), at 96 (2d. ed. 1987) (quotation marks and citation omitted).

4. Interestingly enough, the *Lillard* decision makes no reference to *Smith.*

dant said, " 'Yeah, go ahead. I have no problem with it.' " 965 F.2d at 802. The ensuing search led to the discovery of cocaine and firearms.

The defendant claimed that the traffic violation was a pretext for a drug investigation. In support, he argued that the trooper stopped a disproportionate number of Hispanics, and that he (the defendant) fit the " 'Narcotics Trafficking Characteristics' profile" which had been developed by the Oregon State Police. *Gutierrez–Mederos,* 965 F.2d at 802.

The district court rejected the defendant's allegations. It found that the trooper could not have determined the defendant's ethnic background prior to making the stop; thus, the stop was not based upon the defendant's race. The district court also found that the manner in which the trooper handled the stop indicated that his primary purpose in making the stop was to issue a citation. 965 F.2d at 803. On appeal, both findings were upheld and the district court's decision denying the defendant's motion to suppress was affirmed. 965 F.2d at 803.

Although *Gutierrez–Mederos* follows *Smith,* it recognizes that the Supreme Court has outlined an objective test for analyzing Fourth Amendment violations. Consequently, a subjective approach may not be entirely consistent with applicable Supreme Court precedent. 965 F.2d at 802 n. 1.

In *Scott v. United States,* 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), the Supreme Court emphasized that the Fourth Amendment proscribes unreasonable searches and seizures. Whether a search or seizure is unreasonable depends upon "an objective assessment of [the] officer's actions in light of the facts and circumstances then known to him." *Id.*

However, as long as the officer's actions are objectively justified, it does not matter that the officer's actual state of mind does not coincide with the legal justification. "Reasonableness" is determined "without re-gard to the underlying intent or motivation of the officers involved." *Scott,* 436 U.S. at 138, 98 S.Ct. at 1723.

In sum, "[w]hether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' ... and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon,* 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370 (1985) (quoting *Scott* ).

After *Scott* and *Macon,* this circuit's approach to the question of pretext may require clarification. That issue need not be addressed here, however, because Trooper Kipp's decision to stop Ruesga cannot be considered pretextual under any of the existing tests.

### B. Stop Not Pretextual

When Trooper Kipp first observed Ruesga, they were travelling in opposite directions. Kipp turned around and began to follow Ruesga because he thought Ruesga matched the profile of a drug courier.[5]

██ A law enforcement officer's decision to follow a motorist does not constitute a seizure within the meaning of the Fourth Amendment. *See California v. Hodari D.,* — U.S. ——, ——, 111 S.Ct. 1547, 1552, 113 L.Ed.2d 690 (1991) (a seizure does not occur until a suspect submits to an officer's authority); *United States v. Santamaria–Hernandez,* 968 F.2d 980, 982–83 (9th Cir.1992) (same). Since Kipp did not seize Ruesga merely by following him, the government need not justify Kipp's decision to do so— even though it was based upon little more than a hunch.

██ However, once Kipp activated his overhead lights and Ruesga pulled over, a stop took place. *See Santamaria–Hernandez,* 968 F.2d at 982–83; *Rusher,* 966 F.2d at 876. At that point, the government must demonstrate that Kipp had a reasonable sus-

---

5. According to the profile developed by the Oregon State Police, an Hispanic man who is the sole occupant of a well maintained, high-performance vehicle which has out-of-state license plates may be a cocaine courier. Because His-panic appearance is a factor, the Court has carefully reviewed the record for evidence of bias or prejudice. Having done so, the Court is satisfied that Kipp's actions were not the product of racial animus.

picion that Ruesga was involved in criminal activity.

■ The government does not attempt to justify the stop on the basis of the drug courier profile. *See Smith,* 799 F.2d at 707 (fact that motorist fit drug courier profile did not create reasonable suspicion).[6] Instead, it argues that the stop was based upon a traffic violation.

Ruesga concedes that his vehicle may have crossed either the fog line or the center line after Kipp began to follow him. He doesn't know. After listening to trooper Kipp's testimony, the Court is satisfied that Ruesga's vehicle did in fact cross both lines in the manner indicated by Kipp. Consequently, the Court finds that Ruesga committed a traffic infraction in Kipp's presence, and that Kipp was entitled to stop him under Oregon law.[7]

Ruesga argues that even if he committed an infraction, Kipp's decision to stop him was a pretext for a drug investigation. To support that claim, he points out that Kipp turned around and began to follow him because Kipp suspected drug trafficking.

Ruesga's allegation is unpersuasive. First, there is no evidence that Kipp deviated from routine practice in making this stop. It was his sixth traffic stop of the day. Given the types of violations which he had acted upon earlier in the morning, the Court cannot say that he would have ignored this particular infraction but for his suspicion of drug trafficking.[8]

Second, Kipp handled this stop as a normal traffic violation. After pulling Ruesga over, he obtained Ruesga's license and ran a routine check. Kipp then issued a verbal warning and told Ruesga he was free to go. *See Gutierrez–Mederos,* 965 F.2d at 803.

Finally, the Court found Kipp to be a credible witness. Thus, to the extent Kipp's motivation is germane, the Court accepts his assertion that he stopped Ruesga based upon the traffic infraction. *See Lillard,* 929 F.2d at 502.

## III. DURATION OF STOP

■ Once Trooper Kipp checked Ruesga's license and issued a verbal warning, the purpose for the stop came to an end. If Ruesga was detained after that point, his continued seizure violated the Fourth Amendment since it would have then exceeded the permissible scope of the stop. *Florida v. Royer,* 460 U.S. at 500, 103 S.Ct. at 1325.

■ The duration of the stop must be measured by an objective standard. In essence, detention continues as long as " 'a reasonable person would have believed that he was not free to leave.' " *Id.* at 502, 103 S.Ct. at 1326 (quoting *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

■ After Kipp issued the warning, he told Ruesga that he was free to go. Under the circumstances, a reasonable motorist would have assumed that he could drive off. That Ruesga understood as much is reflected by the fact that he started his car and buckled his seatbelt.

The Court therefore concludes that the traffic stop came to an end once Trooper Kipp told Ruesga that he was free to go. After that point, Ruesga was no longer "seized" within the meaning of the Fourth Amendment.

Although not binding authority, *Rusher* supports the Court's conclusion. There, a North Carolina Highway Patrol trooper stopped a 1974 pickup which did not have a proper license plate, and whose occupants were not wearing seatbelts. The trooper asked the driver to sit in the patrol car while

---

**6.** That did not mean the profile was unconstitutional. *United States v. Smith,* 799 F.2d 704, 708 n. 5 (11th Cir.1986).

**7.** Under the approach adopted by the Eighth Circuit among others, the fact that an infraction was committed in the trooper's presence would be sufficient to justify the stop. *United States v. Cummins,* 920 F.2d 498, 500–01 (8th Cir.1990),

*cert. denied,* —— U.S. ——, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991).

**8.** Under the approach adopted in the Tenth Circuit among others, the fact that Kipp did not deviate from routine practice would tend to provide an objective basis for the stop. *United States v. Guzman,* 864 F.2d 1512, 1517 (10th Cir.1988).

he checked his driver's license and the vehicle registration. After issuing a ticket, the trooper told the driver he was free to go. The trooper then asked the driver whether "there were 'any weapons, illegal contraband, alcohol or anything of an illegal nature in the vehicle.'" 966 F.2d at 871–72. When the driver denied that there were, the trooper asked for consent to search. The driver agreed. 966 F.2d at 872.

On those facts, the Fourth Circuit held that the traffic stop ended when the trooper told the driver he was free to go. Thereafter, the encounter was consensual. 966 F.2d at 877.

## IV. CONSENT

### A. Remain at the Scene

As Ruesga started his car and buckled his seatbelt, Trooper Kipp took a step or so in the direction of his patrol vehicle. Kipp then turned back toward Ruesga and asked him whether he would be willing to answer a few questions.

 Kipp's inquiry does not necessarily constitute a seizure. As long as a reasonable person would have felt free to decline the request and proceed on down the highway, the encounter remained consensual. See Florida v. Bostick, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); United States v. Gonzales, 979 F.2d 711, 713 (9th Cir.1992).

 Where a trooper turns off his patrol vehicle's overhead lights, issues a warning, and tells a driver that he is free to go, the driver would conclude that the stop is over and that he may leave. The driver would understand that he need not answer any further questions. Thus, if the driver does decide to remain, the trooper could reasonably believe that the driver's decision to do so is consensual.

Furthermore, Ruesga's behavior indicates that he remained willingly. After hearing Kipp's request, Ruesga said that he had "no problem" answering additional questions. In fact, Ruesga got out of his car without being asked to do so and began to chat with the trooper.

### B. Roadside Vehicle Search

 Ruesga's vehicle was searched several times on May 2, 1992. The government contends that Ruesga consented to each. While Ruesga's consent would be sufficient to justify warrantless searches and seizures, the government must prove that each consent was given voluntarily. See Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990).

 The voluntariness of consent is a question of fact which must be determined from the totality of the circumstances. United States v. Carbajal, 956 F.2d 924, 931 (9th Cir.1992). Five factors should be considered, none of which is dispositive. United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir. 1988). They include (1) whether the person was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the person was told [he] has a right not to consent; and (5) whether the person was told a search warrant could be obtained. Carbajal, 956 F.2d at 930 n. 3 (citing Castillo, 866 F.2d at 1082). Here, the first, second, and fifth factors reflect the absence of coercion. Ruesga was not in custody; at no time did a law enforcement officer draw a weapon in his presence; and the troopers never suggested that a search warrant could be obtained if he refused consent. By contrast, the third and fourth factors suggest that Ruesga's various decisions to cooperate may not have been fully informed. Ruesga was never told that he could refuse consent, and although he received Miranda warnings, it was only after the searches had been completed. However, on balance, the five Castillo factors indicate that Ruesga's consent to the several searches was voluntarily given. That conclusion is reinforced by the events preceding each search.

 The first search occurred while Ruesga was parked by the side of the highway. He had exited his vehicle to talk with Trooper Kipp, leaving his keys in the ignition. When Kipp asked for permission to search, Ruesga agreed. Ruesga retrieved the keys from the ignition without being prompted; unlocked the trunk; and then

unlocked the door on the passenger's side of the car. Under the circumstances, it was not unreasonable for Trooper Kipp to believe that he had received permission to search Ruesga's vehicle. *Illinois v. Rodriguez*, 497 U.S. at 188, 110 S.Ct. at 2800–01 (under the Fourth Amendment, a law enforcement officer's determination that he has received consent to search must be reasonable).

### C. Accompany Kipp to Bend

▆ A significant sum of money was uncovered during the roadside search; $35,000 according to Ruesga. Kipp told Ruesga that he wanted to count the money, and that he wanted to do the counting at his office. (It would have been impractical to count that sum of money by the side of a highway.) Ruesga did not object. In fact, he said he understood. He asked only that he be given a receipt for the money.

By asking to count the money at his office in Bend, Kipp in effect requested Ruesga to accompany him there. The question is whether Ruesga's decision to do so was voluntary. *United States v. Mendenhall*, 446 U.S. 544, 557, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (citation omitted).

It is important to note that Kipp did not tell Ruesga that the currency was going to be seized (although that was apparently the case). To the contrary, Kipp said only that they needed to go Bend to count the money. Faced with such a request, a reasonable motorist would have felt free to object, and to demand the return of the currency. That Kipp may have refused to honor such a request is beside the point. The fact of the matter is that Ruesga had been given no reason to believe that such a demand would be futile, and that he had no choice but to accompany Kipp to Bend. Thus, keeping in mind the *Castillo* factors discussed above, the Court is satisfied that Ruesga was not coerced into accompanying Kipp to Bend.

### D. Searches at the Bend office

#### 1. Dog sniff

▆ After arriving at the Oregon State Police office, Ruesga locked his car and pocketed the keys. (By doing so, he demonstrat-

ed his continuing control over the vehicle.) Ruesga then went inside with Kipp.

When the troopers finished counting the first batch of currency, Kipp arranged for a trained police dog to smell the bills. In addition, Kipp asked Ruesga if he would allow the dog to inspect his car, and he agreed. Ruesga then went to his car and unlocked it. While the dog was examining the vehicle, Ruesga stood and talked with Kipp.

Under the circumstances, the Court can find no credible evidence that Ruesga was badgered into giving consent. To the contrary, his actions indicate a voluntary decision to cooperate.

#### 2. Subsequent vehicle search

▆ After the dog sniff, Ruesga was informed that the currency was being seized. He was then asked how much money the troopers should have counted. When he indicated over one-hundred thousand dollars, Kipp asked to search his car again. Ruesga once more unlocked his car without hesitation and opened the trunk. The Court is satisfied that Ruesga did so voluntarily.

That conclusion is reinforced by Ruesga's subsequent conduct. When a trooper became stuck trying to retrieve additional bundles of money from a hidden compartment in the trunk, Ruesga told Kipp that there was an easier way to get the money out. In fact, Ruesga got some of his tools and showed Kipp how to do it. Such behavior does not reflect coercion.

### V. CONCLUSION

The encounter between Kipp and Ruesga on May 2, 1992, took many twists and turns. Under the Fourth Amendment, the government must establish that Kipp's behavior was reasonable throughout. *Illinois v. Rodriguez*, 497 U.S. at 186, 110 S.Ct. at 2800. The government has sustained that burden.

IT IS HEREBY ORDERED:

1. The defendant's motion to suppress (Ct.Rec. 29) is denied.

2. The period from December 1, 1992, until February 8, 1993, will be excluded from

the computation of Arturo Ruesga–Ramos's speedy trial deadline. 18 U.S.C. § 3161(h)(1)(F). The same period will also be excluded from computation of each codefendant's speedy trial deadline. 18 U.S.C. 3161(h)(7). *See United States v. Wirsing,* 867 F.2d 1227, 1230 (9th Cir.1989).

3. The Clerk shall withdraw the Court's previous Order Denying Motion to Suppress Fruits of Vehicle Search, and substitute this amended order in its place.

IT IS SO ORDERED.