5 F.3d 543
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Appellee-Plaintiff,
v.
Leonel TAPIA-PEREZ, Appellant-Defendant.
 No. 92-30262.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted May 6, 1993.
Decided Sept. 3, 1993.
 
 1
 Appeal from the United States District Court for the District of Oregon, No. CR-91-374; Robert E. Jones, District Judge, Presiding.
 
 
 2
 D.Or.
 
 
 3
 AFFIRMED.
 
 
 4
 Before: PREGERSON and KLEINFELD, Circuit Judges, and INGRAM,* Senior District Judge.
 
 
 5
 MEMORANDUM**
 
 
 6
 Defendant Leonel Tapia-Perez appeals his conviction by guilty plea for possession with intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. Sec. 841(a)(1). We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm.
 
 BACKGROUND
 
 7
 On September 24, 1992, Officer Shaw, Sergeant George, and Detective Evans of the Portland Airport Inter-Agency Narcotics Team (PAINT) acting on a tip regarding a "suspicious" passenger, followed the passenger to a motel in Portland. The desk clerk informed the officers that the suspect had gone to a room which was registered to defendant Leonel Tapia-Perez ("Tapia-Perez").
 
 
 8
 The officers knocked on the door, announced that they were police, and displayed a police badge to the door's peephole. Tapia-Perez opened the door and permitted the officers to enter. The man the officers were following was also in the room. The officers asked Tapia-Perez if they could search the room and he responded "Yes, go ahead." The officers found nothing.
 
 
 9
 The officers observed some car keys on a table and asked to whom they belonged. When Tapia-Perez said that the keys were his Sergeant George asked if he could search the car and the defendant said "yes." Shortly after leaving to search the defendant's car, Sgt. George returned to the room with some vegetable fragments obtained from the trunk and told the defendant that he believed they were marijuana. Defendant denied possessing any marijuana.
 
 
 10
 Tapia-Perez accompanied George back to the vehicle, and George continued the search. George looked through the trunk of the vehicle and, with Tapia-Perez's help, moved and looked behind a large box located in the trunk. George then opened the car doors, while Tapia-Perez waited behind the vehicle. George observed white paper and brown plastic protruding under the left rear quarter panel and, in the presence of the defendant, he removed the vent cover from the quarter panel of the vehicle and found six kilograms of cocaine wrapped in brown plastic.
 
 
 11
 Tapia-Perez was arrested and Officer Shaw advised Tapia-Perez of his rights in English. When Tapia-Perez appeared to indicate that he did not understand, Detective Evans gave him a card advising him of his rights in Spanish. Officer Shaw testified that, after reading a section of the card a second time, Tapia-Perez indicated that he understood his rights.
 
 
 12
 The officers then interrogated Tapia-Perez in English. The officers testified that Tapia-Perez confessed that the cocaine found in the car was his, and that he had transported the cocaine from California. Tapia-Perez denies making such statements. There is no recording of the confession.
 
 
 13
 Tapia-Perez's native language is Spanish. None of the three officers speak Spanish. All three testified that at all times their conversations with Tapia-Perez occurred in English.
 
 
 14
 Before trial, Tapia-Perez moved to suppress the cocaine and the statements allegedly made to the officers after his arrest. He contended that he did not speak English and therefore could not have understood or knowingly acceded to a request for consent to search his car. Similarly, he contended that he could not have understood his Miranda warnings, knowingly have waived his Fifth Amendment rights, nor given a comprehensible statement in English.
 
 
 15
 At the suppression hearing evidence of Tapia-Perez's inability to speak English consisted of his own testimony and the testimony of Dr. Rod Diamon, a professor of Spanish at Portland State University with 35 years' experience teaching Spanish. Dr. Diamon testified that he had conducted a thirty-minute interview of Tapia-Perez and concluded that Tapia-Perez's English ability was "so rudimentary, that [he] couldn't measure it."
 
 
 16
 Tapia-Perez testified that he was born in Mexico, that he had lived within the Mexican community in the United States for about four years, and that he had received minimal education in the English language. He further testified that when he received a minor traffic citation in California in 1990, he required a court interpreter for his court appearance.
 
 
 17
 In response, the government presented the testimony of the motel clerk and the three officers involved in the search of Tapia-Perez's car. The motel clerk testified that, although she spoke no Spanish, she had no difficulty communicating with Tapia-Perez to check him into his motel room and that she had a five to ten minute "general" conversation with him.
 
 
 18
 The officers testified that all their conversations with defendant had been in English and that he understood and responded.
 
 
 19
 The district court denied Tapia-Perez's motions to suppress, finding that Tapia-Perez's testimony that he did not speak English was not credible and concluded that Tapia-Perez understood "enough street lingo to comprehend what was going on."
 
 
 20
 Accordingly, the court determined that Tapia-Perez had voluntarily consented to the search of his vehicle and that the search was within the scope of such consent.
 
 
 21
 After entering into a plea agreement in which he pleaded guilty to a violation of Title 21 U.S.C. Sec. 841(a)(1) and preserved his right to appeal the district court's denial of his motions to suppress under F.R.Crim.P. Rule 11(a)(2), Tapia-Perez moved for reconsideration of his motions to suppress based on additional evidence that he claimed unequivocally established his inability to speak English. Specifically, Tapia-Perez produced results from standardized English testing conducted by Dr. Marjorie Terdal, Associate Professor of Linguistics at Portland State University.
 
 
 22
 Dr. Terdal's testing resulted in scores showing minimal or no ability in English and indicated that Tapia-Perez "functions minimally if at all in English" and "communicates only through gestures." Dr. Terdal stated that Tapia-Perez would not have understood statements made to him in English by the officers.
 
 
 23
 Tapia-Perez also produced affidavits from two other independent witnesses who had tutored Tapia-Perez in English at the detention center and who agreed with Dr. Terdal's conclusions.
 
 
 24
 The district court denied the motion for reconsideration without explanation. The court then sentenced Tapia-Perez under the Federal Sentencing Guidelines to 120 months imprisonment, five years supervised release, and a $50.00 assessment fee.
 
 
 25
 Tapia-Perez now seeks review of the district court's denial of his suppression motion, contending that the court erred in concluding that he voluntarily consented to the search of his vehicle because his poor English skills precluded such consent. In the alternative, he contends the officers exceeded the scope of any consent by dismantling his vehicle during the search. He therefore contends that his confession following his arrest should be suppressed as fruit of the unlawful search of his vehicle.
 
 ANALYSIS
 
 26
 Whether or not the defendant consented to a search of his vehicle and the scope of that consent are questions of fact. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 36 L.Ed.2d 854, 863, 93 S.Ct. 2041 (1973). As a factual determination, the trial court's conclusion is to be reviewed for clear error. See, e.g., United States v. Hunt, 893 F.2d 1028, 1032 (9th Cir.1990), cert. denied, 112 S.CT. 107 (1991); United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir.1988). "On appeal the evidence must be viewed in the light most favorable to the fact-finder's decision." Castillo, 866 F.2d at 1082.
 
 
 27
 Castillo sets out several factors to be evaluated in determining whether consent to search was voluntary. Id. They are: (1) whether defendant was in custody; (2) whether the officers had their guns drawn; (3) whether Miranda warnings had been given; (4) whether the defendant was told that he had a right not to consent; and (5) whether defendant was told that a search warrant could be obtained. Id. None of the factors is dispositive. Id.
 
 
 28
 Defendant was not told in this case that a search warrant could be obtained or that he had the right to refuse to consent to the search. He was not read his Miranda rights prior to the search because he was not placed under arrest until after the cocaine was found in his car. On the other hand, the district court specifically found that the defendant was not in custody at the time that the officers asked to search his car. Moreover, the officers did not draw their weapons at any time prior to obtaining Tapia-Perez's consent to search.
 
 
 29
 The evidence before the district court was sufficient under normal circumstances to support a finding that the defendant consented to the search of his vehicle. In this case, however, defendant argues that he could not understand English well enough to have knowingly consented to the officers' search and that the district court erred in finding otherwise. This is again a factual determination and therefore to be reviewed under the clearly erroneous standard. See, e.g., United States v. Licata, 761 F.2d 537, 544 (9th Cir.1985).
 
 
 30
 The evidence before the court on this issue was two-sided; On the one hand the professionals testified that Tapia-Perez had only the most rudimentary ability to speak and understand English while on the other hand the police officers and the desk clerk testified that they had no problems conversing with defendant in English. Judy Craeger, the hotel desk clerk, explained that she had no trouble with Tapia-Perez understanding her when she checked him into the room and that when he gave her more money than she asked for the deposit "he said that if he needed to use the phone, that that would take care of it...." Ms. Craeger testified that she had a five to ten minute conversation with Tapia-Perez about how he was and what he was doing in Portland during which he told her that he was visiting friends in Portland.
 
 
 31
 It was up to the district court to assess the credibility of the witnesses before it and to make a choice between the conflicting testimony. Based upon our review of the record we cannot say that this choice was clearly erroneous.
 
 
 32
 As we have concluded that the defendant's consent was voluntary and thus that the search of his car was not illegal, the claim that his confession should be suppressed as the fruit of an unlawful search is moot.
 
 
 33
 Accordingly, we AFFIRM the conviction of Leonel Tapia-Perez for violation of 21 U.S.C. Sec. 841(a)(1).
 
 
 34
 PREGERSON, Circuit Judge, dissenting.
 
 
 35
 I have a problem with the district court's finding that Tapia-Perez understood sufficient English, or "street lingo," to consent voluntarily to the search of his car.
 
 
 36
 At the motion to suppress hearing, Tapia-Perez presented only his own testimony and the expert testimony of Dr. Rod Diamon, a Professor of Spanish and former Chairman of the Foreign Language Department at Portland State University, with 35 years' experience teaching Spanish. Dr. Diamon testified that, based on a thirty-minute interview of Tapia-Perez, he had concluded that Tapia-Perez's English ability "was so rudimentary, that [he] couldn't measure it."
 
 
 37
 In response, the government presented the testimony of the motel clerk and the three officers involved in the search of Tapia-Perez's car. Although the motel clerk testified that she had no difficulty communicating with Tapia-Perez, she also admitted that she had thirteen years' experience communicating with non-English speaking guests at the motel. Similarly, the officers were able to cite only simple verbal exchanges between the officers and Tapia-Perez to support their claim that he understood English and, hence, effectively consented to the search of his car.
 
 
 38
 Nonetheless, the court denied the motion to suppress because it determined that the scope of Dr. Diamon's testing was inadequate. Hence, the court accorded little weight to his testimony. In addition, the court determined that Tapia-Perez's own testimony as to his inability to comprehend English was not credible. Accordingly, the court accepted the essentially uncontroverted testimony of the officers and the motel clerk. In so ruling, however, the court still deemed this "a close case."
 
 
 39
 Immediately thereafter, Tapia-Perez underwent extensive standardized language testing in effort to obtain the type of proof that the court had indicated it would consider dispositive. Dr. Marjorie Terdal, Associate Professor of Applied Linguistics at Portland State University, conducted the testing. The results were unequivocal. Dr. Terdal's testing consistently resulted in scores showing minimal or no ability in English. On the oral test, Tapia-Perez's score of 9 out of a possible 81 placed him at "almost the lowest possible score on this test." This result indicated that he "functions minimally if at all in English" and "communicates only through gestures." In fact, his score was too low to enable him to take the BEST Literacy Skills Test, but he attempted to complete the test orally. "[O]f 127 words, he knew only 14, most of which were numbers." In conclusion, Dr. Terdal stated that Tapia-Perez "does not possess sufficient oral skills in English to understand or speak even the most minimal phrases in English. He would not have understood statements made to him in English by the arresting officers." Dr. Terdal also observed that Tapia-Perez had answered "the questions to the best of his very limited ability." In addition, Tapia-Perez produced affidavits from two other independent witnesses, who fully corroborated Dr. Terdal's findings. These witnesses had tutored Tapia-Perez in English at the detention center.
 
 
 40
 Based on this newly obtained evidence, Tapia-Perez moved for reconsideration of his motion to suppress. The government filed no opposition to Tapia-Perez's motion for reconsideration and presented no additional evidence to rebut the evidence presented therein. Nonetheless, the court held no hearing on the motion; rather, it simply denied the motion without explanation at Tapia-Perez's sentencing hearing.
 
 
 41
 In light of the fact that this same court had deemed the case "close" even before Tapia-Perez introduced the additional, unequivocal, and uncontroverted evidence demonstrating his inability to comprehend English, I would conclude that Tapia-Perez did not comprehend sufficient English to consent voluntarily to the search of his car. Hence, I would hold that the district court's finding to the contrary was clearly erroneous.
 
 
 42
 Accordingly, I respectfully dissent from the majority decision affirming the district court's denial of Tapia-Perez's motion to suppress evidence obtained as a result of the search of his car.
 
 
 
 *
 The HONORABLE WILLIAM A. INGRAM, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3